# NEWARK MORNING LEDGER CO., AS SUCCESSOR TO THE HERALD CO. *v.* UNITED STATES

No. 91–1135.   Argued November 10, 1992—Decided April 20, 1993

BLACKMUN, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, KENNEDY, and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which REHNQUIST, C. J., and WHITE and SCALIA, JJ., joined, *post*, p. 571.

*Robert H. Bork* argued the cause for petitioner. With him on the briefs were *Bernard J. Long, Jr., Albert H. Turkus, Linda A. Fritts, Judith A. Mather, Corinne M. Antley, Peter C. Gould,* and *Steven Alan Reiss.*

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the brief were *Solicitor General Starr, Acting Assistant Attorney General Bruton,*

*Kent L. Jones, Robert S. Pomerance, Francis M. Allegra,* and *Steven W. Parks.*[*]

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the issue whether, under § 167 of the Internal Revenue Code, 26 U. S. C. § 167, the Internal Revenue Service (IRS) may treat as nondepreciable an intangible asset proved to have an ascertainable value and a limited useful life, the duration of which can be ascertained with reasonable accuracy, solely because the IRS considers the asset to be goodwill as a matter of law.[1]

---

[*]Briefs of *amici curiae* urging reversal were filed for Black & Decker Corp. et al. by *Mark I. Levy, Arthur I. Gould, Roger J. Jones,* and *Andrew L. Frey;* for Charles Schwab Corp. by *Glenn A. Smith, Robert C. Alexander,* and *Teresa A. Maloney;* for Donrey, Inc., by *Lester G. Fant III, Daniel M. Davidson, Rex E. Lee,* and *Carter G. Phillips;* for the Independent Insurance Agents of America et al. by *Kenneth J. Kies;* for Magazine Publishers of America, Inc., by *James L. Malone III* and *George W. Benson;* for the New England Fuel Institute et al. by *Gary J. Klein, Bernhardt K. Wruble,* and *John S. Moot;* for the Tax Executives Institute, Inc., by *Timothy J. McCormally* and *Mary L. Fahey;* and for Worrell Enterprises, Inc., by *Malcolm L. Stein* and *Stanley E. Preiser.*

Briefs of *amici curiae* were filed for the American Bankers Association by *John J. Gill III, Michael F. Crotty, Joanne Ames, Philip C. Cook, Terence J. Greene,* and *Timothy J. Peaden;* for the American Business Press by *Robert A. Saltzstein, Stephen M. Feldman,* and *David R. Straus;* for Colorado National Bankshares, Inc., et al. by *James E. Bye* and *Richard G. Wilkins;* for Coopers & Lybrand by *David L. McLean;* for the Investment Counsel Association of America, Inc., by *Kenneth W. Gideon;* for the Newspaper Association of America by *George L. Middleton, Jr.,* and *Corrine M. Yu;* for Philip Morris Companies Inc. by *Jerome B. Libin* and *Padric K. J. O'Brien;* and for *Frederic W. Hickman et al., pro se.*

[1]Section 167 states:

"(a) General rule

"There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

"(1) of property used in the trade or business, or

I

Petitioner Newark Morning Ledger Co., a New Jersey corporation, is a newspaper publisher. It is the successor to The Herald Company with which it merged in 1987. Eleven years earlier, in 1976, Herald had purchased substantially all the outstanding shares of Booth Newspapers, Inc., the publisher of daily and Sunday newspapers in eight Michigan communities.[2] Herald and Booth merged on May 31, 1977, and Herald continued to publish the eight papers under their old names. Tax code provisions in effect in 1977 required that Herald allocate its adjusted income tax basis in the Booth shares among the assets acquired in proportion to their respective fair market values at the time of the merger. See 26 U. S. C. §§ 332 and 334(b)(2) (1976 ed.).[3]

Prior to the merger, Herald's adjusted basis in the Booth shares was approximately $328 million. Herald allocated $234 million of this to various financial assets (cash, securities, accounts and notes receivable, the shares of its wholly owned subsidiary that published Parade Magazine, etc.) and tangible assets (land, buildings, inventories, production

"(2) of property held for the production of income."

Treasury Regulations § 1.167(a)–(3) interprets § 167(a) and states:

"If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill." 26 CFR § 1.167(a)–3 (1992).

[2] The eight Michigan papers were The Ann Arbor News, The Bay City Times, The Flint Journal, The Grand Rapids Press, The Jackson Citizen Patriot, Kalamazoo Gazette, The Muskegon Chronicle, and The Saginaw News.

[3] Section 334(b)(2) was repealed in 1982 and replaced by the somewhat different provisions of the present § 338 of the Code.

equipment, computer hardware, etc.). Herald also allocated $67.8 million to an intangible asset denominated "paid subscribers."[4] This consisted of 460,000 identified subscribers to the eight Booth newspapers as of May 31, 1977, the date of merger. These subscribers were customers each of whom had requested that the paper be delivered regularly to a specified address in return for payment of the subscription price. The $67.8 million figure was petitioner's estimate of future profits to be derived from these at-will subscribers, all or most of whom were expected to continue to subscribe after the Herald acquisition. The number of "paid subscribers" was apparently an important factor in Herald's decision to purchase Booth and in its determination of the appropriate purchase price for the Booth shares. See Brief for Petitioner 4–5. After these allocations, the approximately $26.2 million remaining was allocated to going-concern value and goodwill.

On its federal income tax returns for the calendar years 1977–1980, inclusive, Herald claimed depreciation deductions on a straight-line basis for the $67.8 million allocated to "paid subscribers." The IRS disallowed these deductions on the ground that the concept of "paid subscribers" was indistinguishable from goodwill and, therefore, was nondepreciable under the applicable regulations. Herald paid the resulting additional taxes. After the 1987 merger, petitioner filed timely claims for refund. The IRS took no action on the claims, and, upon the expiration of the prescribed 6-month period, see 26 U. S. C. § 6532(a)(1), petitioner brought suit in

---

[4] According to petitioner, the term " 'paid subscribers' is intended to reflect the fact that the customers in question paid for their newspapers, rather than receiving them for free, and that they subscribed to the newspaper, requesting regular delivery, rather than purchasing it on a single copy basis." Brief for Petitioner 4, n. 5. The term does not connote subscription payments in advance; indeed, the customer relationship was terminable at will.

the District of New Jersey to recover taxes and interest that it claimed had been assessed and collected erroneously.

The case was tried to the court. Petitioner presented financial and statistical experts who testified that, using generally accepted statistical techniques, they were able to estimate how long the average at-will subscriber of each Booth newspaper as of May 31, 1977, would continue to subscribe. The estimates ranged from 14.7 years for a daily subscriber to The Ann Arbor News to 23.4 years for a subscriber to the Sunday edition of The Bay City Times. This was so despite the fact that the total number of subscribers remained almost constant during the tax years in question. The experts based their estimates on actuarial factors such as death, relocation, changing tastes, and competition from other media. The experts also testified that the value of "paid subscribers" was appropriately calculated using the "income approach." Under this, petitioner's experts first calculated the present value of the gross-revenue stream that would be generated by these subscriptions over their estimated useful lives. From that amount they subtracted projected costs of collecting the subscription revenue. Petitioner contended that the resulting estimated net-revenue stream—calculated as $67,773,000 by one of its experts—was a reasonable estimate of the value of "paid subscribers."

The Government did not contest petitioner's expert evidence at all. In fact, it stipulated to the estimates of the useful life of "paid subscribers" for each newspaper. Also, on valuation, the Government presented little or no evidence challenging petitioner's calculations. Instead, it argued that the only value attributable to the asset in question was the cost of generating 460,000 new subscribers through a subscription drive. Under this "cost approach," the Government estimated the value of the asset to be approximately $3 million.

The Government's principal argument throughout the litigation has been that "paid subscribers" represents an asset

indistinguishable from the goodwill of the Booth newspapers. According to the Government, the future stream of revenue expected to be generated by the 460,000 "paid subscribers" represented the very essence of the goodwill value of the newspapers. It argued that because goodwill is nondepreciable, the value of "paid subscribers" cannot be depreciated but must be added to basis so that, when the business is disposed of, the cost of the asset will be deducted from the proceeds in computing capital gain or loss.

The District Court (Judge H. Lee Sarokin) ruled in petitioner's favor. 734 F. Supp. 176 (NJ 1990). It found as a fact that the "paid subscribers" asset was not self-regenerating—it had a limited useful life the duration of which could be calculated with reasonable accuracy. *Id.*, at 180. The court further found that the value of "paid subscribers" was properly calculated using the "income approach" and that the asset itself was separate and distinct from goodwill. "[O]ne must distinguish between a galaxy of customers who may or may not return, whose frequency is unknown, and whose quantity and future purchases cannot be predicted, against subscribers who can be predicted to purchase the same item, for the same price on a daily basis." *Id.*, at 176–177.

The Court of Appeals for the Third Circuit reversed. 945 F. 2d 555 (1991). It concluded that the District Court had erred in defining goodwill as that which remains after all assets with determinable useful lives and ascertainable values have been accounted for. *Id.*, at 568. The court concluded that goodwill has a substantive meaning—the expectancy that " 'old customers will resort to the old place' of business," *id.*, at 567—and that "paid subscribers" is the essence of goodwill. Even though the "paid subscribers" asset may have a limited useful life that can be ascertained with reasonable accuracy, the court held that its value is not separate and distinct from goodwill. *Id.*, at 568.

The Court of Appeals denied petitioner's suggestion for rehearing in banc, with two judges dissenting. See App. to

Pet. for Cert. 52a. In order to resolve an issue of substantial importance under the Internal Revenue Code and to settle a perceived conflict,[5] we granted certiorari, 503 U. S. 970 (1992).

## II

Section 167(a) of the Code allows as a deduction for depreciation a reasonable allowance for the exhaustion and wear and tear, including obsolescence, of property used in a trade or business or of property held for the production of income. See n. 1, *supra*. This Court has held that "the primary purpose" of an annual depreciation deduction is "to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the periods to which it contributes." *Massey Motors, Inc.* v. *United States,* 364 U. S. 92, 104 (1960). The depreciation deduction has been a part of the federal tax system at least since 1909, when Congress recognized that a corporation should calculate its annual net income by deducting from gross income "all losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation of property, if any." Tariff of 1909, § 38 Second, 36 Stat. 113. Nothing in the text of the 1909 statute or in the implementing Treasury Decision precluded a depreciation allowance for intangible property.[6] This changed in

---

[5] Compare the Third Circuit's ruling in the present case with *Donrey, Inc.* v. *United States,* 809 F. 2d 534 (CA8 1987). See also *Citizens & Southern Corp.* v. *Commissioner,* 91 T. C. 463 (1988), aff'd, 919 F. 2d 1492 (CA11 1990).

[6] According to the Treasury Department, the depreciation deduction "should be the estimated amount of the loss, accrued during the year to which the return relates, in the value of the property in respect of which such deduction is claimed that arises from exhaustion, wear and tear, or obsolescence out of the uses to which the property is put . . . . This estimate should be formed upon the assumed life of the property, its cost value, and its use." Treas. Regs. 31, Art. 4, p. 11 (1909).

1914 with the promulgation of Treas. Regs. 33 (1914) issued under the 1913 Income Tax Law.[7]

The Revenue Act of 1918, § 234(a)(7), authorized a "reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence." 40 Stat. 1078 (1919). Treasury Regs. 45 (1919), promulgated under the 1918 Act, explicitly recognized that intangible assets "may be the subject of a depreciation allowance." Art. 163. Thereafter, the regulations governing the depreciation of intangible assets have remained essentially unchanged. The current version is set forth in n. 1, *supra*.

Since 1927, the IRS consistently has taken the position that "goodwill" is nondepreciable.[8] One court has said specifically: "Indeed, this proposition is so well settled that the only question litigated in recent years regarding this area of the law is whether a particular asset is 'goodwill.'" *Hous-*

---

[7] Treasury Regs. 33 provided explicitly that the depreciation deduction should be "estimated on the cost of the *physical property* with respect to which such deduction is claimed, which loss results from wear and tear due to the use to which the property is put" (emphasis added). Art. 159. Furthermore, "[a]ssets of any character whatever which are not affected by use, wear and tear (except patents, copyrights, etc.) are not subject to the depreciation allowance authorized by this act." Art. 162.

[8] Between 1919 and 1927, the IRS recognized that the goodwill of distillers and dealers might be depreciable as a result of the passage of the Eighteenth Amendment prohibiting the manufacture, sale, or transportation of intoxicating liquors. See T. B. R. 44, 1 Cum. Bull. 133 (1919). But in 1926, the Eighth Circuit, in *Red Wing Malting Co.* v. *Willcuts*, 15 F. 2d 626, cert. denied, 273 U. S. 763 (1927), ruled that, under the plain language of the Revenue Act of 1918, goodwill could not be depreciated, for the depreciation provision "limits the allowance for obsolescence to such property as is susceptible to exhaustion, wear, and tear by use in the business, and good will is not such property." 15 F. 2d, at 633. Following *Red Wing Malting*, the Treasury Department amended its regulations to provide: "No deduction for depreciation, including obsolescence, is allowable in respect of good will." T. D. 4055, VI–2 Cum. Bull. 63 (1927). That has been the position of the IRS ever since.

*ton Chronicle Publishing Co.* v. *United States,* 481 F. 2d 1240, 1247 (CA5 1973), cert. denied, 414 U. S. 1129 (1974).

## III

### A

"Goodwill" is not defined in the Code or in any Treasury Department Regulations. There have been attempts, however, to devise workable definitions of the term. In *Metropolitan Bank* v. *St. Louis Dispatch Co.,* 149 U. S. 436 (1893), for example, this Court considered whether a newspaper's goodwill survived after it was purchased and ceased publishing under its old name. It ruled that the goodwill did not survive, relying on Justice Story's notable description of "goodwill" as

> " 'the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices.' " *Id.,* at 446, quoting J. Story, Partnerships § 99 (1841).

In *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153 (1915), the Court described goodwill as "that element of value which inheres in the fixed and favorable consideration of customers, arising from an established and well-known and well-conducted business." *Id.,* at 165. See also *Los Angeles Gas & Electric Corp.* v. *Railroad Comm'n of California,* 289 U. S. 287, 313 (1933) (distinguishing "going concern" from "good will" when fixing rates for public utilities).

Although the definition of goodwill has taken different forms over the years, the shorthand description of goodwill as "the expectancy of continued patronage," *Boe* v. *Commis-*

*sioner,* 307 F. 2d 339, 343 (CA9 1962), provides a useful label with which to identify the total of all the imponderable qualities that attract customers to the business. See *Houston Chronicle Publishing Co.* v. *United States,* 481 F. 2d, at 1248, n. 5. This definition, however, is of little assistance to a taxpayer trying to evaluate which of its intangible assets is subject to a depreciation allowance. The value of every intangible asset is related, to a greater or lesser degree, to the expectation that customers will continue their patronage.[9] But since 1918, at least some intangible assets have been depreciable. Because intangible assets do not exhaust or waste away in the same manner as tangible assets, taxpayers must establish that public taste or other socioeconomic forces will cause the intangible asset to be retired from service, and they must estimate a reasonable date by which this event will occur. See B. Bittker & M. McMahon, Federal Income Taxation of Individuals ¶12.4, p. 12–10 (1988). Intangibles such as patents and copyrights are depreciable over their "legal lives," which are specified by statute. Covenants not to compete, leaseholds, and life estates, for example, are depreciable over their useful lives that are expressly limited by contract.

---

[9] We emphasize that while the "expectancy of continued patronage" is a serviceable description of what we generally mean when we describe an intangible asset that has no useful life and no ascertainable value, this shibboleth tells us nothing about whether the asset in question is depreciable. The dissent concedes that "the law concerning the depreciation of intangible assets related to goodwill has developed on a case-by-case basis," *post,* at 576, n. 4, yet, inexplicably, it suggests that "[s]uch matters are not at issue in this case, however, because the asset that Ledger seeks to depreciate is indistinguishable from goodwill," *ibid.* As we demonstrate below, an intangible asset with an ascertainable value and a limited useful life, the duration of which can be ascertained with reasonable accuracy, is depreciable under § 167 of the Code. The fact that it may also be described as the "expectancy of continued patronage" is entirely beside the point.

The category of intangibles that has given the IRS and the courts difficulty is that group of assets sometimes denominated "customer-based intangibles." This group includes customer lists, insurance expirations, subscriber lists, bank deposits, cleaning-service accounts, drugstore-prescription files, and any other identifiable asset the value of which obviously depends on the continued and voluntary patronage of customers. The question has been whether these intangibles can be depreciated notwithstanding their relationship to "the expectancy of continued patronage."

### B

When considering whether a particular customer-based intangible asset may be depreciated, courts often have turned to a "mass asset" or "indivisible asset" rule. The rule provides that certain kinds of intangible assets are properly grouped and considered as a single entity; even though the individual components of the asset may expire or terminate over time, they are replaced by new components, thereby causing only minimal fluctuations and no measurable loss in the value of the whole. The following is the usually accepted description of a mass asset:

> "[A] purchased terminable-at-will type of customer list is an indivisible business property with an indefinite, nondepreciable life, indistinguishable from—and the principal element of—goodwill, whose ultimate value lies in the expectancy of continued patronage through public acceptance. It is subject to temporary attrition as well as expansion through departure of some customers, acquisition of others, and increase or decrease in the requirements of individual customers. A normal turnover of customers represents merely the ebb and flow of a continuing property status in this species, and does not within ordinary limits give rise to the right to deduct for tax purposes the loss of individual customers. The whole is equal to the sum of its fluctuating parts at any

given time, but each individual part enjoys no separate capital standing independent of the whole, for its disappearance affects but does not interrupt or destroy the continued existence of the whole." *Golden State Towel & Linen Service, Ltd.* v. *United States,* 179 Ct. Cl. 300, 310, 373 F. 2d 938, 944 (1967).

The mass-asset rule prohibits the depreciation of certain customer-based intangibles because they constitute self-regenerating assets that may change but never waste. Although there may have been some doubt prior to 1973 as to whether the mass-asset rule required that any asset related to the expectancy of continued patronage always be treated as nondepreciable goodwill as a matter of law, that doubt was put to rest by the Fifth Circuit in the *Houston Chronicle* case. The court there considered whether subscription lists, acquired as part of the taxpayer's purchase of The Houston Press, were depreciable. The taxpayer had no intention of continuing publication of the purchased paper, so there was no question of the lists' being self-regenerating; they had value only to the extent that they furnished names and addresses of prospective subscribers to the taxpayer's newspaper. After reviewing the history of the mass-asset rule, the court concluded that there was no *per se* rule that an intangible asset is nondepreciable whenever it is related to goodwill. On the contrary, the rule does not prevent taking a depreciation allowance "if the taxpayer properly carries his dual burden of proving that the intangible asset involved (1) has an ascertainable value separate and distinct from goodwill, and (2) has a limited useful life, the duration of which can be ascertained with reasonable accuracy." *Houston Chronicle,* 481 F. 2d, at 1250.

Following the decision in *Houston Chronicle,* the IRS issued a new ruling, modifying prior rulings "to remove any implication that customer and subscription lists, location contracts, insurance expirations, etc., are, as a matter of law, indistinguishable from goodwill possessing no determinable

useful life." Rev. Rul. 74–456, 1974–2 Cum. Bull. 65, 66. The IRS continued to claim that customer-based intangibles generally are in the nature of goodwill, representing "the customer structure of a business, their value lasting until an indeterminate time in the future." Nonetheless, it acknowledged that, "in an unusual case," the taxpayer may prove that the "asset or a portion thereof does not possess the characteristics of goodwill, is susceptible of valuation, and is of use to the taxpayer in its trade or business for only a limited period of time." *Ibid.* Under these circumstances, the IRS recognized the possibility that the customer-based intangible asset could be depreciated over its useful life.

Despite the suggestion by the Court of Appeals in this case that the mass-asset rule is "now outdated," 945 F. 2d, at 561, it continues to guide the decisions of the Tax Court with respect to certain intangible assets. In *Ithaca Industries, Inc.* v. *Commissioner,* 97 T. C. 253 (1991), for example, the Tax Court recently considered whether a taxpayer could depreciate the value allocated to the trained work force of a purchased going concern over the length of time each employee remained with the purchasing company. The court acknowledged that "whether the assembled work force is an intangible asset with an ascertainable value and a limited useful life separate from goodwill or going-concern value is a question of fact." *Id.,* at 263–264. After reviewing the record, it concluded that the mass-asset rule applied to prohibit the depreciation of the cost of acquiring the assembled work force:

> "Although the assembled work force is used to produce income, this record fails to show that its value diminishes as a result of the passing of time or through use. As an employee terminated his or her employment, another would be hired and trained to take his or her place. While the assembled work force might be subject to temporary attrition as well as expansion through departure of some employees and the hiring of others, it

would not be depleted due to the passage of time or as a result of use. The turnover rate of employees represents merely the ebb and flow of a continuing work force. An employee's leaving does not interrupt or destroy the continued existence of the whole." *Id.*, at 267.

As a factual matter, the Tax Court found that the taxpayer hired a new worker only so it could replace a worker "who resigned, retired, or was fired." *Id.*, at 268. The court found that the "assembled work force" was a nondiminishing asset; new employees were trained in order to keep the "assembled work force" unchanged, and the cost of the training was a deductible expense. *Id.*, at 271.

## IV

Since 1973, when *Houston Chronicle* clarified that the availability of the depreciation allowance was primarily a question of fact, taxpayers have sought to depreciate a wide variety of customer-based intangibles. The courts that have found these assets depreciable have based their conclusions on carefully developed factual records. In *Richard S. Miller & Sons, Inc.* v. *United States*, 210 Ct. Cl. 431, 537 F. 2d 446 (1976), for example, the court considered whether a taxpayer was entitled to a depreciation deduction for 1,383 insurance expirations that it had purchased from another insurer.[10] The court concluded that the taxpayer had carried its heavy burden of proving that the expirations had an ascertainable value separate and distinct from goodwill and had a limited useful life, the duration of which could be ascertained with reasonable accuracy. The court acknowledged

---

[10] An "expiration" is a copy of the face of an insurance policy made when the policy is issued. It shows the name of the insured, the type of insurance, the premium, the covered property, and the expiration date. "Its principal value in the insurance business is its indication of the most advantageous time to solicit a renewal." *Richard S. Miller & Sons, Inc.* v. *United States*, 210 Ct. Cl., at 436, 537 F. 2d, at 450.

that the insurance expirations constituted a "mass asset" the useful life of which had to be "determined from facts relative to the whole, and not from experience with any particular policy or account involved." *Id.*, at 443, 537 F. 2d, at 454. The court also noted, however, that the mass-asset rule does not prevent a depreciation deduction "where the expirations as a single asset can be valued separately and the requisite showing made that the useful life of the information contained in the intangible asset as a whole is of limited duration." *Id.*, at 439, 537 F. 2d, at 452. All the policies were scheduled to expire within three years, but their continuing value lay in their being renewable. Based on statistics gathered over a 5-year period, the taxpayer was able to estimate that the mass asset had a useful life of not more than 10 years from the date of purchase. Any renewals after that time would be attributable to the skill, integrity, and reputation of the taxpayer rather than to the value of the original expirations. "The package of expirations demonstrably was a wasting asset." *Id.*, at 444, 537 F. 2d, at 455. The court ruled that the taxpayer could depreciate the cost of the collection of insurance expirations over the useful life of the mass asset.

In *Citizens & Southern Corp.* v. *Commissioner*, 91 T. C. 463 (1988), aff'd, 919 F. 2d 1492 (CA11 1990), the taxpayer argued that it was entitled to depreciate the bank-deposit base acquired in the purchase of nine separate banks.[11] The taxpayer sought to depreciate the present value of the income it expected to derive from the use of the balances of deposit accounts existing at the time of the bank purchases.

---

[11] The term "deposit base" describes "the intangible asset that arises in a purchase transaction representing the present value of the future stream of income to be derived from employing the purchased core deposits of a bank." *Citizens & Southern Corp.* v. *Commissioner*, 91 T. C., at 465. The value of the deposit base rests upon the "ascertainable probability that inertia will cause depositors to leave their funds on deposit for predictable periods of time." *Id.*, at 500.

The Commissioner argued that the value of the core deposits was inextricably related to the value of the overall customer relationship, that is, to goodwill. The Commissioner also argued that the deposit base consisted of purchased, terminable-at-will customer relationships that are equivalent to goodwill as a matter of law. The Tax Court rejected the Commissioner's position, concluding that the taxpayer had demonstrated with sufficient evidence that the economic value attributable to the opportunity to invest the core deposits could be (and, indeed, was) valued and that the fact that new accounts were opened as old accounts closed did not make the original purchased deposit base self-regenerating. 91 T. C., at 499.

The court also concluded that, based on "lifing studies" estimating the percentage of accounts that would close over a given period of time, the taxpayer established that the deposit base had a limited useful life, the duration of which could be ascertained with reasonable accuracy. The taxpayer had established the value of the intangible asset using the cost-savings method, entitling it to depreciate that portion of the purchase price attributable to the present value of the difference between the ongoing costs associated with maintaining the core deposits and the cost of the market alternative for funding its loans and other investments. *Id.*, at 510.

The Tax Court reached the same result in *Colorado National Bankshares, Inc.* v. *Commissioner*, 60 TCM 771 (1990), ¶ 90,495 P–H Memo TC, aff'd, 984 F. 2d 383 (CA10 1993). The Tax Court concluded that

"the value of the deposit base does not depend upon a vague hope that customers will patronize the bank for some unspecified length of time in the future. The value of the deposit base rests upon the ascertainable probability that inertia will cause depositors to leave their funds on deposit for predictable periods of time."

*Colorado National Bankshares,* 60 TCM, at 789, ¶ 90,495 P–H Memo TC, at 2,396.

The court specifically found that the deposit accounts could be identified; that they had limited lives that could be estimated with reasonable accuracy; and that they could be valued with a fair degree of accuracy. They were also not self-regenerating. "It is these characteristics which separate them from general goodwill and permits separate valuation." *Ibid.* See also *IT&S of Iowa, Inc.* v. *Commissioner,* 97 T. C. 496, 509 (1991); *Northern Natural Gas Co.* v. *O'Malley,* 277 F. 2d 128, 139 (CA8 1960) (concurring opinion).

The Eighth Circuit has considered a factual situation nearly identical to the case now before us. In *Donrey, Inc.* v. *United States,* 809 F. 2d 534 (1987), the taxpayer sought to depreciate the subscription list of a newspaper it had purchased as a going concern. The taxpayer asserted that the subscription list was not simply a list of customers but "a machine to generate advertising revenue." *Id.,* at 536. There was expert testimony that the value of the subscription list was "the present value of the difference in advertising revenues generated by the subscription list as compared to the revenues of an equivalent paper without a subscription list." *Ibid.* A jury found that the list had a limited useful life, the duration of which could be ascertained with reasonable accuracy; that the useful life was 23 years; and that it had an ascertainable value of $559,406 separate and distinct from goodwill. The District Court denied a motion for judgment notwithstanding the verdict after concluding that, although reasonable minds could have differed as to the correct result, there was evidence from which the jury could properly find for the taxpayer. The Court of Appeals implicitly rejected the Government's argument that the subscription list was necessarily inseparable from the value of goodwill when it deferred to the jury's finding that the subscription list was depreciable because it had a determinable useful life and an ascertainable value.

## V

## A

Although acknowledging the "analytic force" of cases such as those discussed above, the Court of Appeals in the present case characterized them as "no more than a minority strand amid the phalanx of cases" that have adopted the Government's position on the meaning of goodwill. 945 F. 2d, at 565.[12] "In any case, consistent with the prevailing case law, we believe that the [IRS] is correct in asserting that, for tax purposes, there are some intangible assets which, notwithstanding that they have wasting lives that can be estimated with reasonable accuracy and ascertainable values, are nonetheless goodwill and nondepreciable." *Id.*, at 568. The Court of Appeals concluded further that in "the context of the sale of a going concern, it is simply often too difficult for the taxpayer and the court to separate the value of the list *qua* list from the goodwill value of the customer relationships/structure." *Ibid.* We agree with that general observation. It is often too difficult for taxpayers to separate depreciable intangible assets from goodwill. But sometimes they manage to do it. And whether or not they have been successful in any particular case is a question of fact.

The Government concedes: "The premise of the regulatory prohibition against the depreciation of goodwill is that, like stock in a corporation, a work of art, or raw land, good-

---

[12] At least one commentator has taken issue with the Court of Appeals' characterization of the recent cases as nothing but a "minority strand." See Avi-Yonah, Newark Morning Ledger: A Threat to the Amortizability of Acquired Intangibles, 55 Tax Notes 981, 984 (1992) (of the 14 cases cited by the Third Circuit that were decided after *Houston Chronicle* in 1973, the IRS has prevailed in only 6 of them; "hardly an 'overwhelming weight of authority' in the IRS' favor, especially given that two of the IRS victories, but none of the taxpayers,' were only at the district court level"). Regardless of whether the cases discussed in Part IV, *supra,* are characterized as a "minority strand" or as a "modern trend," we find their reasoning and approach persuasive.

will has no determinate useful life of specific duration." Brief for United States 13. See also *Richard S. Miller & Sons, Inc.* v. *United States,* 210 Ct. Cl., at 437, 537 F. 2d, at 450 ("Goodwill is a concept that embraces many intangible elements and is presumed to have a useful life of indefinite duration"). The entire justification for refusing to permit the depreciation of goodwill evaporates, however, when the taxpayer demonstrates that the asset in question wastes over an ascertainable period of time. It is more faithful to the purposes of the Code to allow the depreciation deduction under these circumstances, for "the Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes," *INDOPCO, Inc.* v. *Commissioner,* 503 U. S. 79, 84 (1992).[13]

In the case that first established the principle that goodwill was not depreciable, the Eighth Circuit recognized that the reason for treating goodwill differently was simple and direct: "'As good will does not suffer wear and tear, does not become obsolescent, is not used up in the operation of the business, depreciation, as such, cannot be charged against it.'" *Red Wing Malting Co.* v. *Willcuts,* 15 F. 2d 626, 633 (1926), cert. denied, 273 U. S. 763 (1927). See also 5 J. Mer-

---

[13] The dissent suggests that we are usurping the proper role of Congress by seeking to "modify the *per se* ban on depreciating goodwill," *post,* at 582, n. 10. But we are doing nothing of the kind. We simply have determined that, in light of the factual record in this case, the "paid subscribers" asset is depreciable. The dissent's mistake is to assume that because the "paid subscribers" asset looks and smells like the "expectancy of continued patronage," it is, *ipso facto,* nondepreciable. In our view, however, whether or not an asset is depreciable is not a question to be settled by definition. "Goodwill" remains nondepreciable under applicable regulations, and we do not purport to change that fact. In interpreting those regulations, however, we have concluded that because the "paid subscribers" is an asset found to have a limited useful life and an ascertainable value which may be determined with reasonable accuracy, it is depreciable. By definition, therefore, it is not "goodwill."

tens, Law of Federal Income Taxation § 23A.01, p. 7 (1990) ("Goodwill is not amortizable intangible property *because* its useful life cannot be ascertained with reasonable accuracy" (emphasis added)). It must follow that if a taxpayer can prove with reasonable accuracy that an asset used in the trade or business or held for the production of income has a value that wastes over an ascertainable period of time, that asset is depreciable under § 167, regardless of the fact that its value is related to the expectancy of continued patronage. The significant question for purposes of depreciation is not whether the asset falls "within the core of the concept of goodwill," Brief for United States 19, but whether the asset is capable of being valued and whether that value diminishes over time. In a different context, the IRS itself succinctly articulated the relevant principle: "Whether or not an intangible asset, or a tangible asset, is depreciable for Federal income tax purposes depends upon the determination that the asset is actually exhausting, and that such exhaustion is susceptible of measurement." Rev. Rul. 68–483, 1968–2 Cum. Bull. 91–92.

B

Although we now hold that a taxpayer able to prove that a particular asset can be valued and that it has a limited useful life may depreciate its value over its useful life regardless of how much the asset appears to reflect the expectancy of continued patronage, we do not mean to imply that the taxpayer's burden of proof is insignificant. On the contrary, that burden often will prove too great to bear. See, *e. g.,* Brief for Coopers & Lybrand as *Amicus Curiae* 11 ("For example, customer relationships arising from newsstand sales *cannot* be specifically identified. In [our] experience, customers were identified but their purchases were too sporadic and unpredictable to reasonably ascertain either the

duration of the relationships or the value of the relationships (based on their net income stream)" (emphasis in original)).

Petitioner's burden in this case was made significantly lighter by virtue of the Government's litigation strategy:

"[B]ecause of the stipulation reached by the parties, Morning Ledger need not prove either the specific useful lives of the paid subscribers of the Booth newspapers as of May 31, 1977, or that Dr. Glasser [its statistical expert] has correctly estimated those lives. In light of the stipulation, [the Government's] argument with regard to Dr. Glasser's estimation of the specific useful lives of the Booth subscribers is wholly irrelevant. Instead, Dr. Glasser's testimony establishes that qualified experts could estimate with reasonable accuracy the remaining useful lives of the paid subscribers of the Booth newspapers as of May 31, 1977." 734 F. Supp., at 181.

Petitioner also proved to the satisfaction of the District Court that the "paid subscribers" asset was not self-regenerating, thereby distinguishing it for purposes of applying the mass-asset rule:

"[T]here is no automatic replacement for a subscriber who terminates his or her subscription. Although the total number of subscribers may have or has remained relatively constant, the individual subscribers will not and have not remained the same, and those that may or have discontinued their subscriptions can be or have been replaced only through the substantial efforts of the Booth newspapers." Id., at 180.

The 460,000 "paid subscribers" constituted a finite set of subscriptions, existing on a particular date—May 31, 1977. The asset was not composed of constantly fluctuating components; rather, it consisted of identifiable subscriptions each

of which had a limited useful life that could be estimated with reasonable accuracy according to generally accepted statistical principles. Petitioner proved as a matter of fact that the value of the "paid subscribers" diminished over an ascertainable period of time.[14]

## C

Petitioner estimated the fair market value of the "paid subscribers" at approximately $67.8 million. This figure was found by computing the present value of the after-tax subscription revenues to be derived from the "paid subscribers," less the cost of collecting those revenues, and adding the present value of the tax savings resulting from the depreciation of the "paid subscribers." As the District Court explained, the taxpayer's experts "utilized this method because they each independently concluded that this method best determined the additional value of the Booth newspapers attributable to the existence of the paid subscribers as of May 31, 1977, and, thus, the fair market value of those subscribers." *Id.*, at 183. The Government presented no evidence challenging the accuracy of this methodology. It

---

[14] The dissent spends a substantial amount of time worrying about the sufficiency of petitioner's evidence. See *post*, at 576–582. The problem with petitioner's expert, according to the dissent, is that he predicted only how long a subscriber is likely to subscribe, and this "tells us nothing about how long date-of-sale subscriber habit or inertia will remain a cause of predicted subscriber faithfulness." *Post*, at 581. The dissent concludes that "Ledger's expert on his own terms has not even claimed to make the showing of definite duration necessary to depreciate an asset under § 167(a)." *Post*, at 582. We have little doubt that had the Government presented credible evidence challenging the relevance of this testimony, the District Court would have had a more difficult time deciding this case. As it happened, however, petitioner's evidence of the useful life of the "paid subscribers" was the only evidence the District Court had before it. The dissent skillfully demonstrates certain vulnerabilities in petitioner's proof, but the Government chose, rather, to rest its entire case on a legal argument that we now reject. This case was lost at trial.

took the view that the only value attributable to the "paid subscribers" was equivalent to the cost of generating a similar list of new subscribers, and it estimated that cost to be approximately $3 million. The Court of Appeals agreed with the Government that this "cost approach" was the only appropriate method for valuing the list of subscribers. "The fact is that, when employed in the context of the sale of an ongoing concern, the income approach to valuing a list of customers inherently includes much or all of the value of the expectancy that those customers will continue their patronage—i. e., the goodwill of the acquired concern." 945 F. 2d, at 568.

Both the Government and the Court of Appeals mischaracterized the asset at issue as a mere list of names and addresses. The uncontroverted evidence presented at trial revealed that the "paid subscribers" had substantial value over and above that of a mere list of customers. App. 67 (Price Waterhouse's Fair Market Value Study of Paid Newspaper Subscribers to Booth Newspapers as of May 31, 1977); *id.*, at 108–111 (testimony of Roger J. Grabowski, Principal and National Director, Price Waterhouse Valuation Services). These subscribers were "seasoned"; they had subscribed to the paper for lengthy periods of time and represented a reliable and measurable source of revenue. In contrast to new subscribers, who have no subscription history and who might not last beyond the expiration of some promotional incentive, the "paid subscribers" at issue here provided a regular and predictable source of income over an estimable period of time. The cost of generating a list of *new* subscribers is irrelevant, for it represents the value of an entirely different asset. We agree with the District Court when it concluded:

> "Although it was possible to estimate the direct cost of soliciting additional subscribers to the Booth newspapers, those subscribers if obtained were not and would not have been comparable, in terms of life characteris-

tics or value, to the paid subscribers of the Booth newspapers as of May 31, 1977. . . . The cost of generating such marginal subscribers would not reflect the fair market value of the existing subscribers of the Booth newspapers as of May 31, 1977." 734 F. Supp., at 181.

Because it continued to insist that petitioner had used the wrong valuation methodology, the Government failed to offer any evidence to challenge the accuracy of petitioner's application of the "income approach." The District Court found that the aggregate fair market value of the "paid subscribers" of the Booth newspapers as of May 31, 1977—*i. e.*, "the price at which the asset would change hands between a hypothetical willing buyer and willing seller, neither being under any compulsion to buy or sell, both parties having reasonable knowledge of relevant facts," *id.*, at 185—was $67,773,000, with a corresponding adjusted income tax basis of $71,201,395. Petitioner was entitled to depreciate this adjusted basis using a straight-line method over the stipulated useful lives.

## VI

Petitioner has borne successfully its substantial burden of proving that "paid subscribers" constitutes an intangible asset with an ascertainable value and a limited useful life, the duration of which can be ascertained with reasonable accuracy. It has proved that the asset is not self-regenerating but rather wastes as the finite number of component subscriptions are canceled over a reasonably predictable period of time. The relationship this asset may have to the expectancy of continued patronage is irrelevant, for it satisfies all the necessary conditions to qualify for the depreciation allowance under § 167 of the Code.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE SCALIA join, dissenting.

Newark Morning Ledger seeks a depreciation[1] deduction under 26 U. S. C. § 167(a) for an intangible asset it variously refers to as "paid subscribers," see Brief for Petitioner 4–5, or "subscriber relationships," see Tr. of Oral Arg. 3. The Court of Appeals rejected Ledger's claim on the authority of a Treasury regulation providing (a) that an intangible asset may be depreciated only if it has a limited useful life "the length of which can be estimated with reasonable accuracy," and (b) that "[n]o deduction for depreciation is allowable with respect to goodwill." 26 CFR § 1.167(a)–3 (1992); see 945 F. 2d 555, 558, 567–569 (CA3 1991). Ledger claims the regulation raises no bar to a deduction, arguing that (1) the asset is not goodwill, because (2) it has a limited useful life actually estimated with reasonable accuracy. Ledger is wrong on both counts. Ledger's asset is unmistakably a direct measurement of goodwill, and Ledger's expert testimony failed to show any particular lifespan for the goodwill Ledger acquired.

I

When The Herald Company (now merged with Newark Morning Ledger) bought and liquidated the stock of Booth Newspapers, Inc., it allocated $67.8 million of the stock's adjusted basis to an asset called "paid subscribers." Although, as will appear, this label is misdescriptive, it need not confuse anyone about the true nature of the asset, since Ledger has explained clearly how it determined the asset's value. Ledger got to the $67.8 million figure by predicting the fu-

---

[1] Black's Law Dictionary tells us that intangible assets are amortized, while tangible assets are depreciated. Black's Law Dictionary 83, 441 (6th ed. 1990); see also Gregorich, Amortization of Intangibles: A Reassessment of the Tax Treatment of Purchased Goodwill, 28 Tax Law. 251, 253 (1975) ("Amortization is the commonly accepted way of referring to depreciation of intangible property"). The statute and the regulations, however, use only the term depreciation.

ture net revenues to be generated by the 460,000 people who subscribed to the eight Booth newspapers as of the date of sale, May 31, 1977. Because these customers had neither paid in advance nor agreed to subscribe for any set term, see Brief for Petitioner 4, n. 5; *ante,* at 550, n. 4, they were merely at-will subscribers; the value of their expected future custom was capitalized as the asset Ledger seeks to depreciate.

However much Ledger claims this asset to be something different from "goodwill," the settled meaning of the term is flatly at odds with Ledger's contention. Since the days of Justice Story, we have understood the concept of "goodwill" to be anchored in the patronage a business receives from "constant or habitual" customers. See, *e. g., Metropolitan Bank* v. *St. Louis Dispatch Co.,* 149 U. S. 436, 446 (1893); *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153 (1915); see also *Cruttwell* v. *Lye,* 17 Ves. Jr. 335, 346, 34 Eng. Rep. 129, 134 (Ch. 1810) (opinion of Lord Eldon) (goodwill is "nothing more than the probability, that the old customers will resort to the old place"). Although this Court has not had occasion to provide a precise definition of the term as it appears in the depreciation regulation, the Courts of Appeals have consistently held that "goodwill," in this context, refers to "the expectancy of continued patronage" from existing customers or, alternatively, to the prospect that "the old customers will resort to the old place." See, *e. g., Winn-Dixie Montgomery, Inc.* v. *United States,* 444 F. 2d 677, 681 (CA5 1971); *Commissioner* v. *Seaboard Finance Co.,* 367 F. 2d 646, 649 (CA9 1966); *Boe* v. *Commissioner,* 307 F. 2d 339, 343 (CA9 1962); *Dodge Brothers, Inc.* v. *United States,* 118 F. 2d 95, 101 (CA4 1941); see also *Golden State Towel & Linen Service, Ltd.* v. *United States,* 179 Ct. Cl. 300, 305–309, 373 F. 2d 938, 941–943 (1967); *Karan* v. *Commissioner,* 319 F. 2d 303, 306 (CA7 1963) (goodwill denotes an expectancy that a customer relationship will continue "without contractual compulsion"). Thus, the Government justifiably concludes that

"goodwill," as used in its own regulation, refers to the expectation of continued patronage by existing customers. See Brief for United States 16–19.

Under this accepted definition of "goodwill," there can be no doubt that the asset Ledger calls "paid subscribers" or "subscriber relationships" is simply the goodwill associated with those subscribers. Once this is clear, it becomes equally clear that Ledger should lose, since the intangible asset regulation expressly and categorically bars depreciation of goodwill, and courts have uniformly relied on that regulation's plain language to conclude that goodwill is nondepreciable as a matter of law. See *Houston Chronicle Publishing Co.* v. *United States*, 481 F. 2d 1240, 1247 (CA5 1973) (the proposition that goodwill is nondepreciable as a matter of law "is so well settled that the only question litigated in recent years regarding this area of the law is whether a particular asset is 'goodwill'"), cert. denied, 414 U. S. 1129 (1974); see also *Donrey, Inc.* v. *United States*, 809 F. 2d 534, 536 (CA8 1987) (goodwill "is ineligible per se for the depreciation deduction"); *Richard S. Miller & Sons, Inc.* v. *United States*, 210 Ct. Cl. 431, 437, 537 F. 2d 446, 450 (1976) ("the presumption that [goodwill] is a nondepreciable capital asset is conclusive"); *Boe* v. *Commissioner, supra*, at 343 ("good will is not a depreciable asset").

## II

Ledger tries to slip out of this predicament by two separate steps. It argues first that the Court ought to adopt a new definition of "goodwill" that would not cover any expectation of future custom with a lifespan subject to definite advance estimate; then it claims that the asset here falls outside the new definition because Ledger's expert has predicted the length of the asset's wasting life with reasonable accuracy. See Brief for Petitioner 12–13. The Court makes a serious mistake in taking the first step; Ledger should lose

in any event, however, since its expert has failed to furnish the basis for taking the second.

## A

Ledger would have us scrap the accepted and substantive definition of "goodwill" as an expectation of continued patronage, in favor of a concept of goodwill as a residual asset of ineffable quality, whose existence and value would be represented by any portion of a business's purchase price not attributable to identifiable assets with determinate lives. Goodwill would shrink to an accounting leftover. See *id.*, at 19, 29–30 (relying on accounting standards).

In accommodating Ledger on this point, see *ante*, at 565, n. 13, the Court abandons the settled construction of a regulation more than 65 years old,[2] see T. D. 4055, VI–2 Cum.

---

[2] The current intangible asset regulation can be traced back to Treasury Regulation 45, issued in 1919, which provided that there could be no deduction "in respect of good will" under the general depreciation provision of the Revenue Act of 1918 because goodwill was an example of an asset that did not have a useful life "definitely limited in duration." T. D. 2831, 21 Treas. Dec. 214, Art. 163. The Commissioner dropped the reference to goodwill for a few years, in response to attempts by distillers and brewers to depreciate goodwill made obsolete by the adoption of the Eighteenth Amendment. See T. D. 2929, 1 Cum. Bull. 133 (1919); see also T. D. 3146, 23 Treas. Dec. 402, Art. 163 (1920) (reflecting this change). The first Court of Appeals to address the subject, however, held that goodwill could not be depreciated under the Revenue Act of 1918 because it was not susceptible to exhaustion or wear and tear, as required by the statute. *Red Wing Malting Co.* v. *Willcuts*, 15 F. 2d 626 (CA8 1926), cert. denied, 273 U. S. 763 (1927). Shortly after that decision, the Commissioner amended the intangible asset regulation by adding the following prohibition: "No deduction for depreciation, including obsolescence, is allowable in respect of good will." T. D. 4055, VI–2 Cum. Bull. 63 (1927). It has remained there ever since. See, *e. g.*, Treas. Regs. 77, Art. 203 (Revenue Act of 1932); Treas. Regs. 86, Art. 23(*l*)–3 (Revenue Act of 1934); Treas. Regs. 94, Art. 23(*l*)–3 (Revenue Act of 1936); Treas. Regs. 103, § 19.23(*l*)–3 (Internal Revenue Code of 1939); 26 CFR § 1.167(a)–3 (1961) (Internal Revenue Code of 1954).

Although *Red Wing Malting* provoked a Circuit split, this Court resolved the conflict a few years later by deciding, in line with the Commis-

Bull. 63 (1927), and repudiates the equally settled interpretation of the corresponding section of the tax code itself. We are, after all, dealing with a statute reenacted without substantial change not less than six times since 1919, see Revenue Act of 1918, § 234(a)(7), 40 Stat. 1078 (1919); Revenue Act of 1932, § 23(k), 47 Stat. 181; Revenue Act of 1934, § 23(*l*), 48 Stat. 689; Revenue Act of 1936, § 23(*l*), 49 Stat. 1660; Revenue Act of 1938, § 23(*l*), 52 Stat. 462; Internal Revenue Code of 1939, § 23(*l*), 53 Stat. 14; Internal Revenue Code of 1954, § 167(a), 68A Stat. 51, and we may presume that Congress has accepted the understanding set out in the cognate intangible asset regulation and in the judicial decisions that have clarified that regulation's terms.[3] *Lorillard* v. *Pons*, 434 U. S. 575, 580 (1978); *United States* v. *Correll*, 389 U. S. 299, 305–306 (1967); *Helvering* v. *Winmill*, 305 U. S. 79, 83 (1938). The consequences, therefore, of acceding to Ledger's argument are at once a rejection of statutory interpretation settled by Congress itself through reenactment of the tax code and a further invasion of the political domain to rewrite a Treasury regulation.[4] See *Correll, supra*, at 307 (this Court

---

sioner's amended regulation, that a brewery could not deduct for the "exhaustion" or "obsolescence" of goodwill as a result of Prohibition. See *Clarke* v. *Haberle Crystal Springs Brewing Co.*, 280 U. S. 384 (1930); *Renziehausen* v. *Lucas*, 280 U. S. 387 (1930); see also *V. Loewers Gambrinus Brewery Co.* v. *Anderson*, 282 U. S. 638 (1931) (distinguishing *Haberle Springs* and allowing a brewery to claim a depreciation deduction for buildings made obsolete by Prohibition).

[3] Legislative materials indicate that Congress is, in fact, aware of the accepted definition of "goodwill." See, *e. g.*, H. R. Conf. Rep. No. 100–495, p. 937 (1987) ("Goodwill has been defined as the expectancy of continued patronage, for whatever reason, or as the probability that old customers will resort to the old place").

[4] The majority discounts these consequences by claiming that the utility of the accepted definition of "goodwill" is limited because "[t]he value of every intangible asset is related, to a greater or lesser degree, to the expectation that customers will continue their patronage." *Ante*, at 556. But the regulation does not provide that every intangible asset related to goodwill is nondepreciable; rather, it simply states that goodwill itself is

will defer to a tax regulation so long as it "implement[s] the congressional mandate in some reasonable manner"); *National Muffler Dealers Assn., Inc.* v. *United States*, 440 U. S. 472, 477 (1979) (listing historical considerations that may give a regulation "particular force"); see also *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843–845 (1984) (reasonable agency interpretations of statutory provisions will be upheld).

I cannot deny, however, that the regulation would suffer real internal tension between its specific, categorical treatment of goodwill and its general analytical test (turning on the existence of a limited life of ascertainable duration), if modern accounting techniques were to develop a subtlety sufficient to make an accurate estimate of goodwill's useful life. Fortunately or not, however, the record in this case raises no such tension.

B

Even under Ledger's revision of the regulation, a depreciation deduction would depend on showing the Booth newspapers' goodwill to have a useful life both limited and measurable with some reasonable degree of certainty. The further step needed for victory is thus evidentiary in nature, and

---

nondepreciable. Subject to this prohibition, the law concerning the depreciation of intangible assets related to goodwill has developed on a case-by-case basis, and the Government has accepted some of the distinctions that courts have drawn, including the principle that customer lists sold separately from a going business may be depreciable. See Brief for United States 36, n. 34; Rev. Rul. 74–456, 1974–2 Cum. Bull. 65, 66 (modifying earlier rulings "to remove any implication that customer and subscription lists, location contracts, insurance expirations, etc., are, as a matter of law, indistinguishable from goodwill"). Such matters are not at issue in this case, however, because the asset that Ledger seeks to depreciate is indistinguishable from goodwill. See 945 F. 2d 555, 568 (CA3 1991) (Newark Morning Ledger did not attempt, in this case, to claim a separate depreciation allowance for the subscriber lists it acquired).

Ledger's success or failure is solely a function of the evidentiary record. Ledger has failed.

Here, it is helpful to recall one defining characteristic of the only kind of asset Ledger claims to be entitled to depreciate: it must be an asset acquired from Booth Newspapers, Inc., upon the sale of its stock to Ledger's predecessor, Herald. If the goodwill is to be depreciated at all, in other words, it must be goodwill purchased, not goodwill attributable to anything occurring after the purchase date. It must be an expectation of continued patronage as it existed when the old Booth newspapers changed hands.

Assuming that there is a variety of goodwill that may be separately identified as an asset on the date of sale, some limitation on its useful life may be presumed. Whatever may be the force of habit, or inertia, that is valued as goodwill attributable to events occurring before the date of sale, the influence of those events wanes over time, and so must the habit or inertia by which that influence is made manifest and valued as goodwill. On the outside, the economically inert subscribers will prove to be physically mortal.[5]

---

[5] While some courts have viewed goodwill as having an indefinite useful life, others have concluded that although goodwill does waste, its useful life cannot be determined with reasonable accuracy. Compare, *e. g., Red Wing Malting*, 15 F. 2d, at 633 (goodwill is not depreciable because it "does not suffer wear and tear, does not become obsolescent, [and] is not used up in the operation of the business"); *Patterson* v. *Commissioner*, 810 F. 2d 562, 569 (CA6 1987) (goodwill "does not waste"); *Houston Chronicle Publishing Co.* v. *United States*, 481 F. 2d 1240, 1248 (CA5 1973) (goodwill is "an ongoing asset that fluctuates but does not necessarily diminish"); *Landsberger* v. *McLaughlin*, 26 F. 2d 77, 78 (CA9 1928) (goodwill is not subject to exhaustion, wear or tear), with, *e. g., Dodge Brothers, Inc.* v. *United States*, 118 F. 2d 95, 100 (CA4 1941) (goodwill is not depreciable because of "manifest difficulties" inherent in estimating its life span); *Illinois Cereal Mills, Inc.* v. *Commissioner*, 46 TCM 1001, 1023 (1983), ¶ 83,469 P–H Memo TC (goodwill is not subject to depreciation "because [its] useful life is not susceptible of reasonable estimation").

What the Government does not concede,[6] however, and what Ledger has not proven, is the duration of that date-of-sale influence and consequent goodwill. Ledger, indeed, has not even purported to show that. Instead, its expert has estimated the quite different periods over which subscribers on the date of sale will continue to subscribe to the various papers.[7] In the District Court, Ledger offered a single witness for its claim to have estimated the useful life of each newspaper's "subscriber relationships" with reasonable accuracy. Herald had originally hired that witness, Dr. Gerald Glasser, to predict the average remaining lives of existing subscriptions to the eight Booth newspapers. See App. in

---

[6] In an effort to insulate the case from review, Ledger asserts a concession by the Government below that the asset Ledger wants to depreciate did have a limited useful life that was estimated with reasonable accuracy. Brief for Petitioner 17, and n. 18. The majority does not go quite so far when it observes that "[p]etitioner's burden in this case was made significantly lighter by virtue of the Government's litigation strategy." *Ante*, at 567. In any event, the District Court's description of the Government's strategy makes it clear that the Government has not conceded this case away:

"The parties have agreed that, if the Court determines that the paid subscribers constitute assets which were separate and apart from goodwill and which can be valued separate and apart from goodwill, and if the Court determines that the paid subscribers had useful lives which can be estimated with reasonable accuracy, then the paid subscribers of the Booth newspapers can be depreciated on a straight-line basis over the . . . useful lives [shown in the accompanying chart]." 734 F. Supp. 176, 180 (NJ 1990). Thus, the factual concession by the Government came into play only after the District Court rejected two crucial legal arguments: (1) the "paid subscribers" asset is not an asset separate and distinct from goodwill, and (2) the asset did not have a useful life that could be estimated with reasonable accuracy. I find, for the reasons set out in the text, that the District Court erred in rejecting each argument. I also note that a similar litigating strategy did not prevent the Government from prevailing in *Haberle Springs*. See 280 U. S., at 386 ("The amount of the deduction to be made is agreed upon if any deduction is to be allowed").

[7] The estimates vary from paper to paper, but I refer to them in the singular, consistently with Ledger's claim to a singular "asset."

No. 90–5637 (CA3), p. 1010.   Dr. Glasser testified that he first compiled statistics on the length of time existing sub-scribers had received each newspaper, by directing a survey that asked a selection of those subscribers one central ques-tion: "For how long has the [newspaper] been delivered to your present address?"   *Id.*, at 157, 166, 182–183, 1012.   He then made a crucial assumption, that the total number of subscriptions to each newspaper would remain stable over time.   *Id.*, at 170–172, 187, 194–195.   Finally, by subjecting the survey results to techniques of statistical analysis based on this crucial assumption, Dr. Glasser produced a series of figures that, he said, represented the average remaining life of existing subscriptions to each newspaper.   Solely on the basis of Dr. Glasser's testimony, the District Court held that "the remaining useful lives of the paid subscribers of the Booth newspapers as of May 31, 1977, could be estimated with reasonable accuracy."   734 F. Supp. 176, 181 (NJ 1990).

Dr. Glasser's assumption is the key not only to the results he derived, but to the irrelevance of those results to the pre-dictable life on the date of sale of the goodwill (or "paid sub-scribers") actually purchased from Booth.   The key, in turn, to that irrelevance lies not in Dr. Glasser's explicit statement of his assumption, but in what the assumption itself presup-poses.   Since the District Court was not concerned with predicting the value that any given Booth newspaper might have in the future (as distinct from predicting the useful life of pre-existing subscriber goodwill), an assumption that the level of a paper's subscriptions would remain constant was useful only insofar as it had a bearing on predicting the be-havior of the old subscribers.   For this purpose, assuming a constant subscription level was a way of supposing that a given newspaper would remain as attractive to subscribers in the future as it had been during the period prior to the newspaper's sale.   The assumption was thus a surrogate for the supposition that the new owners would not rock the boat and would succeed in acting intelligently to keep the paper,

if not exactly as it had always been, at least as relatively attractive as it had been in relation to its various competitors on the date of sale.

What is significant about this assumption for present purposes is not its doubtful validity,[8] but the very fact of its being an assumption about the behavior of the paper's man-

---

[8] No matter how much presale satisfaction subscribers have, it seems intuitively obvious that a high enough level of postsale dissatisfaction with a paper would drive subscribers away, as might other postsale events, such as successful competition and demographic changes. The District Court, relying on Ledger's own witnesses, noted several of the many possible reasons that lead subscribers to cancel their subscriptions:

"Subscribers are lost because of death, relocation, lack of reader time or interest, changing lifestyles, and other factors that are beyond the control of the newspapers. Also, subscribers are lost due to dissatisfaction with the product or service and for various other reasons, including competition from other media sources, such as radio, television, magazines and other paid-circulation and/or free-distribution newspapers." 734 F. Supp., at 180.

Ledger's statistician, in effect, made an assumption regarding Ledger's ability to manage the innumerable factors that keep current customers coming back for more, as well as its ability to attract new customers as the old ones leave. Such discretionary decisions may turn out to be foolish or wise: if foolish, the subscriber base as of the date of sale could be destroyed rapidly; if wise, it would be maintained. The simple recognition that some papers increase their subscriber base over time, while others lose it (and some actually fold), underscores the arbitrariness of the assumption made by Ledger's expert witness. In any event, Ledger has provided no evidence to support this assumption.

I do not, of course, suggest that a buyer's treatment of a depreciable asset does not affect the asset's actual useful life. A machine's less durable parts must be replaced; it must be oiled, kept from the weather, given fuel, and so on. But there is an identifiable object that endures through time and does not just disappear from inadequate maintenance. Goodwill, on the other hand, can be destroyed rapidly by everything from the nasty personality of a new proprietor to distaste for his publishing policies. Prediction of goodwill's endurance must always be fraught with a relatively high degree of chance, for discretionary decisions, rather than just ministerial acts (like oiling the gears), must be taken into account.

agement after the date of sale. And since this assumption is the basis for a prediction about the life of subscriptions existing on the date of sale, that prediction is by definition not simply about the duration of subscriber goodwill (or habit or inertia) as it existed on the date the paper changed hands. On the contrary, it is a prediction about the combined effect of presale goodwill and postsale satisfaction with the paper as Ledger presumably continues to produce it. Nowhere in Dr. Glasser's testimony do we find an opinion that the presale goodwill has a life coextensive with the predicted life of the subscriptions, and nowhere do we find an opinion about the point at which the old goodwill finally peters out as a measurable, and hence valuable, influence on the old subscribers' behavior. It is not, of course, important for present purposes whether such an opinion would be possible, though I am skeptical that it would be.[9] But it is important that no such evidence exists in this case. In place of evidence showing the depreciable lifespan of date-of-sale goodwill with a reasonable degree of accuracy, Ledger has presented evidence of how long an old subscriber will remain one, on the assumption that the subscriber's prior satisfaction is confirmed, and (for all we know) replaced, with satisfaction resulting from Ledger's publishing performance over the years following its acquisition of a given newspaper.

This, of course, misses the point entirely. In telling us merely how long a subscriber is likely to subscribe, Ledger tells us nothing about how long date-of-sale subscriber habit or inertia will remain a cause of predicted subscriber faithfulness. Since, however, only the date-of-sale probability of faithfulness could be entitled to depreciation as a pur-

---

[9] Goodwill results from such a mix of influences over time that it seems unlikely that the skein of them all could be untangled to identify the degree to which even present custom results from the goodwill purchased, as distinct from goodwill subsequently cultivated. Ledger has not even attempted such a disentanglement.

chased asset, Ledger's expert on his own terms has not even claimed to make the showing of definite duration necessary to depreciate an asset under § 167(a). Indeed, once duration of subscriptions and purchased goodwill are seen to be conceptually different, Ledger's claim to have satisfied the requirements for depreciating an intangible asset simply vanishes. Ledger's entire case thus rests on the confusion of subscription duration with goodwill on the date of sale, and only that confusion could suggest that Ledger has shouldered its burden of estimating the lifespan of the asset purchased from Booth. It is not surprising, then, that the Commissioner has stood by her categorical judgment that goodwill is not depreciable, that Congress has not disturbed this judgment,[10] and that lower courts have consistently agreed that goodwill is nondepreciable as a matter of law.

## III

Because the Court of Appeals correctly reversed on the basis that Newark Morning Ledger failed to demonstrate that the asset it sought to depreciate was not goodwill, which

---

[10] The majority claims its approach to be "more faithful to the purposes of the Code," in allowing taxpayers to make a better match of expenses with revenues. *Ante,* at 565 (citing *INDOPCO, Inc.* v. *Commissioner,* 503 U. S. 79 (1992)). Such policy initiatives are properly left to Congress, which can modify the *per se* ban on depreciating goodwill at any time. Despite several recent opportunities to do so, Congress has so far refused to alter the tax treatment of goodwill and other intangibles. See, *e. g.,* H. R. 11, 102d Cong., 2d Sess., § 4501 (1992) (as returned from conference, Oct. 5, 1992) (proposing amortization of purchased goodwill and certain other intangible assets over a 14-year period); H. R. 4210, 102d Cong., 2d Sess., § 4501 (1992) (as returned from conference, Mar. 20, 1992) (same); H. R. 3040, 102d Cong., 2d Sess., § 302 (1992) (as returned from the Committee on Finance, June 19, 1992) (16-year period); H. R. 3035, 102d Cong., 1st Sess., § 1 (1991) (as introduced, July 25, 1991) (14-year period); see also H. Res. 292, 102d Cong., 1st Sess. (1991) (adopted Nov. 26, 1991, 137 Cong. Rec. H11317–H11318) (concerning the effective date of "any legislation enacted with respect to amortization of goodwill").

is nondepreciable as a matter of law, see 945 F. 2d, at 568, I would affirm the judgment below.   From the Court's holding to the contrary, I respectfully dissent.