TURNER OUTDOOR ADVERTISING, LTD., MANDERSON & ASSOCIATES, INC., TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Turner Outdoor Advertising v. Commissioner
Docket No. 12123-93
United States Tax Court
T.C. Memo 1995-227; 1995 Tax Ct. Memo LEXIS 229; 69 T.C.M. (CCH) 2692; May 23, 1995, Filed *229 Decision will be entered under Rule 155. T, a partnership, purchased the assets of an outdoor advertising company. R has challenged T's allocation of cost to certain depreciable assets (the sign plant). P, the tax matters partner of T, petitioned for a readjustment. P argues that the cost (fair market value) of the sign plant was approximately $ 30 million. Alternatively, P argues that, if the cost of the sign plant was less than $ 30 million, the difference should be allocated to a depreciable intangible asset in the form of certain leasehold interests that T purchased. 1. Held: The cost of the sign plant was $ 27,924,586. 2. Held, further, P has failed to show that it purchased a depreciable intangible asset in the form of certain leasehold interests. 3. Held, further, T correctly accounted for the costs incurred when it demolished or took down certain signs. For petitioner: David M. Wooldridge, Timothy A. Bush. For respondent: Robert J. Shilliday, Jr., and Lawrence B. Austin. HALPREN HALPREN MEMORANDUM FINDINGS OF FACT AND OPINION HALPREN, Judge: This is a proceeding for the readjustment of various adjustments to the partnership *230 returns of Turner Outdoor Advertising, Ltd. (Turner), for Turner's taxable (calendar) years 1983 through 1987. The details of the adjustments are set forth in the notice of final partnership administrative adjustment sent to petitioner, Manderson & Associates, Inc., the tax matters partner of Turner, on March 15, 1993. The parties have settled several issues. The issues remaining for decision concern the fair market value of certain assets (principally outdoor advertising signs) acquired by Turner on August 1, 1983, and the tax treatment of certain signs demolished by Turner. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT Stipulations of Fact
Some of the facts have been stipulated and are so found. The stipulations of fact filed by the parties and attached exhibits are incorporated herein by this reference. Computation Stipulation
The parties have also entered into a "Stipulation of Computations of Fair Market Value" (the computation stipulation). The computation stipulation contains a number of *231 rules, certain facts, certain definitions, and a methodology that the parties agree the Court should follow to find the fair market value of the outdoor advertising signs acquired by Turner on August 1, 1983. The methodology consists of 40 steps that will lead the Court to the fair market value of such assets. Some of those steps request the Court to accept certain stipulated values for certain items, while many of the remainder request the Court to find the value of certain items. There are also computational steps, which are agreed upon by the parties. An exhibit to the computation stipulation consists of a computer disk on which is a spreadsheet on which are entered many stipulated amounts and on which the Court is requested to enter various findings of values. Execution of the spreadsheet will allow the Court to determine the fair market value in question. The Court accepts the computation stipulation and will follow it to find fair market value. Stipulated facts set forth in the computation stipulation that have not otherwise been found are so found. The computation stipulation is set forth in an appendix hereto, along with a printout of an executed copy of the spreadsheet. *232 General Background
Turner
Turner is a limited partnership organized and existing under the laws of the State of Alabama and having a principal place of business in Atlanta, Georgia. Turner was organized on July 27, 1983. Petitioner was incorporated under the laws of the State of Alabama on June 1, 1983. At the time the petition herein was filed, petitioner had its principal office in Atlanta, Georgia. 1983 Acquisition
On June 9, 1983, petitioner entered into an agreement styled "Business Assets Purchase Agreement" (the agreement) with Turner Advertising Co., a Georgia general partnership (seller), for the purchase by petitioner of certain assets of seller. By the agreement, seller agreed to sell its accounts receivable, leases, contracts, government licenses and permits, nongovernment licenses and permits, display leases, operating property, and real property. In major part, those assets constitute the plant of an outdoor advertising company. The term "plant" is used in the outdoor advertising industry to refer, collectively, to an outdoor advertising company's office, shop facilities, real estate, machinery and equipment, furniture and fixtures, outdoor advertising *233 signs (signs), and display locations (i.e., property on which signs are placed). The term "sign plant" refers to the signs and display locations acquired from seller. [1] By the agreement, petitioner agreed to pay to seller $ 33,990,000, subject to certain adjustments. In addition, petitioner agreed to pay $ 10,000 pursuant to a license agreement for the use of the trade name "Turner". Petitioner assigned its rights under the agreement to Turner, and, on August 1, 1983, Turner acquired the assets described in the agreement. Outdoor Advertising Signs
A sign consists of a *234 display face (sometimes face), support structure or frame, and the platform, apron, illumination, or other fixtures attached thereto. A face is the part of a sign that is constructed from prefabricated interlocking panels to create a flat surface upon which an advertising message may be painted, pasted, or otherwise affixed. In the outdoor advertising industry, signs are categorized by face. The three types of faces are: poster, junior poster, and bulletin. The faces of posters and junior posters are generally of a standard size, 12 feet high by 25 feet wide for posters and 6 feet high by 12 feet wide for junior posters. The surface areas of posters and junior posters are, generally, 300 square feet and 72 square feet, respectively. Poster and junior poster faces generally have a border, referred to as trim, that is attached to the perimeter of the display surface. The advertising on posters and junior posters is generally advertising copy printed on posting paper, which is pasted on the face of the sign. Bulletin faces vary considerably in size and shape, and, typically, they are larger than posters. Typical sizes are 14 feet high by 48 feet wide, containing a total surface *235 area of 672 square feet, and 20 feet high by 60 feet wide, containing a total surface area of 1,200 square feet. A bulletin typically has the advertising copy painted on the face of the sign. The frame supporting the face may vary widely in size and design. Some frames support more than one face. Most frames are built with two or more steel I-beams. Some posters and bulletins are mounted on frames supported by a single pole (a unipole), and are referred to as unipole posters and unipole bulletins. Signs Acquired by Turner
The actual number of faces and frames acquired by Turner at the August 1, 1983, closing was as follows: Sign Category
Faces
Frames
Poster
2,120
1,177
Junior poster
68
58
Bulletin
377
302
Unipole poster
23
10
Unipole bulletin
96
60
The actual number of display location leases (leases) acquired by Turner at the August 1, 1983, closing was 1,278. Value of Assets Other Than Sign Plant
On August 1, 1983, the fair market values of certain assets acquired by Turner were as follows: Trade name license
$ 10,000 Accounts receivable
1,985,855 less: allowance
(442,318)
Inventory
201,227 Prepaids
367,240 Construction in progress
3,685 Land
478,700 Leasehold improvements
218,100 Automobiles and trucks
25,050 Furniture and fixtures
86,960 Machinery and equipment
376,775 Office and shop leasehold
140,000 Coca-Cola bulletin
272,500 Total
3,723,774 *236 Computation Stipulation
The following facts are found pursuant to the methodology set forth in the computation stipulation. The number preceding each finding corresponds to a paragraph in the computation stipulation in which we are requested to determine an amount or value. See appendix (computation stipulation), infra. Face
4. The costs of materials for face, platform, trim, and apron (as necessary) are as follows: Poster
$ 1,055 - display face
$ 248 - platform
Bulletin $ 2,275 - display face
$ 1,379 - platform
$ 832 - apron
Unipole poster
$ 1,055 - display face
Unipole bulletin
$ 2,625 - display face
$ 892 -apron
6. The sales tax rate to be applied to the face materials cost is 4.5 percent. 7. The face materials cost (including, when applicable, trim, platforms, and aprons) of the average poster, junior poster, bulletin, unipole poster, and unipole bulletin shall be increased by an amount equal to 10 percent of such cost to account for freight, handling, crating, and waste. Illumination
13. The sales tax rate to be applied to the illumination materials cost is 4.5 percent. 14. The illumination materials cost of the average poster, *237 bulletin, unipole poster, and unipole bulletin shall be increased by an amount equal to 10 percent of such cost to account for freight, handling, crating, and waste. Frame
18. Frame materials cost for the average unipole structure is a subcontract cost. 19. The unipole contract price does not include sales tax. 20. The sales tax rate to be applied to the average frame materials cost for the average poster, junior poster, and bulletin is 4.5 percent. 21. The frame materials cost of the average poster, junior poster, and bulletin shall be increased by an amount equal to 10 percent of such cost to account for freight, handling, crating, and waste. Labor
22. The total labor hours necessary for an average sign in each category are as follows: Hours to construct
Poster
250.63
Junior poster
29.47
Bulletin
522.86
Hours to assemble and erect face
Unipole poster face [1]
184.78
Unipole bulletin face
314.34
23. Labor costs are determined using the allocation method (as that method is *238 defined by the parties). 25. Construction of the signs was performed by workers from one of four work categories: construction laborer, crew chief or crane operator (crane operator), electrician, and painter. The average hourly wage includes fringe benefits but excludes labor overhead and indirect labor costs. The average hourly wage for each worker category is as follows: Construction laborer
$ 15.07
Crane operator
$ 15.87
Electrician
$ 18.60
Painter
$ 17.00
The breakdown of total labor hours of an average sign in each sign category by worker category is as follows: Worker Category
Hours
Poster
Construction laborer
182.58
Crane operator
24.05
Electrician
26.77
Painter
17.23
Junior Poster
Construction laborer
25.86
Painter
3.61
Bulletin
Construction laborer
396.75
Crane operator
37.38
Electrician
47.03
Painter
41.70
Unipole Poster
Construction laborer
133.45
Crane operator
13.33
Electrician
38.00
Unipole Bulletin
Construction laborer
205.53
Crane operator
30.30
Electrician
78.51
Labor costs are not increased for nonproductive time. Other Costs
28. An application fee due to the City of Atlanta for permit applications *239 is added to the permit fees in the following amounts: Poster
$ 135
Junior poster
$ 21
Bulletin
$ 210
Unipole poster
$ 135
Unipole bulletin
$ 311
30. The overhead rate to be applied to sign costs is 30 percent. That rate shall be applied to the costs of materials (including freight, handling, crating, and waste), labor, sales tax, lease procurement, permit fees (including application fee), construction preparation, auger rental (if applicable), unipole frame subcontract (if applicable), and general contracting surcharge. 31. The profit rate of 10 percent shall be applied to the costs of materials (including freight, handling, crating, and waste), labor, sales tax, lease procurement, permit fees (including application fee), construction preparation, auger rental (if applicable), unipole frame subcontract (if applicable), and general contracting surcharge. 32. The costs of the average poster, junior poster, bulletin, unipole poster, and unipole bulletin shall not be increased for the acquisition of engineering drawings. 33. The costs of the average poster, junior poster, and bulletin shall be increased by $ 700 to account for auger rental. 34. Unipole frame materials *240 cost for the average unipole structure is a subcontract cost. The unipole contract price does not include sales tax. The sales tax rate of 4.5 percent shall be applied to the unipole frame materials cost. 35. The costs of an average poster, junior poster, and bulletin shall be adjusted for a general contracting surcharge on auger rental. The costs of an average unipole poster and unipole bulletin shall be adjusted for a general contracting surcharge on the unipole subcontract cost. The rate of the general contracting surcharge on auger rental and the unipole subcontract cost shall be 10 percent of such costs. 36. Lease procurement cost is a direct cost of each sign structure. 37. The cost associated with the procurement of the average lease is $ 1,000. Demolitions and Takedowns
A demolition or takedown of a sign occurs (a) when a sign is condemned; (b) on the nonrenewal or termination of the lease on the property on which the sign is located; (c) on the occurrence of an act of God or accident; or (d) upon various other circumstances relating to sign visibility. Upon demolition or takedown, the signs are dismantled and the reusable parts are returned to the shop *241 facilities. During the years at issue, Turner typically returned all reusable materials to inventory and treated them as such for accounting and tax purposes. During the years in issue, Turner had sign demolitions or takedowns as follows: Taxable Year
Demolitions or Takedowns
1983
41
1984
58
1985
64
1986
37
1987
37
Total
237
ULTIMATE FINDINGS OF FACT TURNER OUTDOOR ADVERTISING FACTS TO BE DETERMINED BY THE COURT PART VI SUMMARY OF PLANT VALUATION [1]
JUNIOR
DESCRIPTION
POSTER POSTER
BULLETIN
Direct cost
Face
$ 2,687.12
$ 271.16
$ 6,411.36
Light
899.15
0.00
2,012.46
Frame
1,415.22
164.03
4,747.17
Labor
3,923.99
451.08
8,155.90
Subtotal
8,925.48
886.28
21,326.89
Other cost
Lease procurement
795.00
795.00
795.00
Permit, poster
37.00
37.00
0.00
Permit, bulletin
0.00
0.00
87.00
Permit, Atlanta
135.00
21.00
210.00
Construction prep.
123.00
123.00
123.00
Subcontracted work
700.00
700.00
700.00
Drawings
0.00
0.00
0.00
Supervision
70.00
70.00
70.00
Subtotal
1,860.00
1,746.00
1,985.00
Total per
10,785.48
2,632.28
23,311.89
structure cost
Times structures
1,177  58  302  Class total
12,694,504.51
152,672.08
7,040,189.47
Plant total
Misc. construction
material & tools
Specialized vehicles
and equipment
Subtotal
Overhead
30.00%
Profit
10.00%
Total value before depreciation
Less Depreciation at 12.50%
Subtotal
Lease Procurement
Total Fair Market Value
as of 8/1/83
*242 UNIPOLE UNIPOLE
DESCRIPTION
POSTER
BULLETIN Direct cost
Face
$ 2,778.34
$ 6,442.78
Light
1,492.62
3,647.51
Frame
0.00
0.00
Labor
2,929.44
5,038.48
Subtotal
7,200.40
15,128.77
Other cost
Lease procurement
795.00
795.00
Permit, poster
37.00
0.00
Permit, bulletin
0.00
87.00
Permit, Atlanta
135.00
311.00
Construction prep.
123.00
123.00
Subcontracted work
23,878.25
23,878.25
Drawings
0.00
0.00
Supervision
2,387.83
2,387.83
Subtotal
27,356.08
27,582.08
Total per
34,556.47
42,710.85
structure cost
Times structures
10  60  Class total
345,564.71
2,562,650.92
Plant total
22,795,581.70
Misc. construction
0  material & tools
Specialized vehicles
0  and equipment
Subtotal
22,795,581.70
Overhead
6,838,674.51
Profit
2,279,558.17
Total value before depreciation
31,913,814.38
Less Depreciation at 12.50%
3,989,226.80
Subtotal
27,924,587.58
Lease Procurement
0  Total Fair Market Value
$ 27,924.587.58
as of 8/1/83
OPINION I. Introduction
On August 1, 1983, Turner acquired the business assets of Turner Advertising Co. (seller) for a total price of $ 34 million. *243 The parties have agreed as to the allocation for Federal income tax purposes of $ 3,723,774 of that price. Of the remaining $ 30,276,226, we must determine how much is allocable to depreciable assets. Turner argues that, of such remaining $ 30,276,226, $ 29,865,787 is properly allocable to the sign plant (comprising depreciable assets) acquired from seller. [2] Alternatively, if we should find that less than $ 29,865,787 is allocable to the sign plant, Turner argues that as much as $ 6,528,771 of such difference is allocable to depreciable leasehold interests acquired from seller. Respondent argues that the amount allocable to the sign plant does not exceed $ 11,973,953 and denies that any amount is allocable to depreciable leasehold interests. We also must determine the proper income tax treatment of certain costs incurred in the demolition or takedown of certain signs. *244 II. Allocation to Depreciable Assets
A. Introduction
Section 167 allows a depreciation deduction for property used in a trade or business. Generally speaking, the basis for depreciation for property acquired by purchase is cost. Secs. 167(g), 1011, 1012. Where both depreciable and nondepreciable property are acquired for a lump sum, the purchase price must be allocated between such depreciable and nondepreciable property on the basis of the value of each in order to determine the basis of the depreciable property. Sec. 1.167(a)-5, Income Tax Regs. Petitioner bears the burden of proof. Rule 142(a). B. Expert Witness Reports
For the most part, the parties have relied on expert opinion to determine the value of the depreciable assets acquired by Turner. Petitioner presented two experts: Wayne N. Nelson (Nelson), an officer of the American Appraisal Co., Minneapolis, Minnesota, and Gerald G. Gray (Gray), a principal of Gerald G. Gray & Associates, Minneapolis, Minnesota. Respondent also presented two experts, one of whom was not accepted as qualified by the Court. Respondent's remaining expert was Richard B. Hedenquist (Hedenquist), an engineer employed *245 by respondent. All of the experts that were accepted as qualified by the Court assigned a value to the sign plant acquired by Turner. Nelson and Hedenquist assigned a value to goodwill (which is not depreciable). Gray assigned a value to the leasehold interests acquired by Turner. The experts assigned values to the sign plant (excluding the Coca Cola Bulletin), and goodwill and other intangibles as follows: Asset Nelson
Gray
Hedenquist
Signs -- from all
$ 29,865,787
$ 24,000,000
$ 12,616,757
sign categories
Goodwill
457,821
17,659,469
Other intangibles-
6,528,771
leasehold interest
Total
30,323,608
30,528,771
30,276,226
C. Valuation Methodology
All of the experts whose opinions were accepted used a cost (reproduction or replacement) method to determine the fair market value of the sign plant, treating the plant as if it had been acquired on a "turnkey" basis. Because of the complexities involved in the number and type of signs to be valued here, the parties have agreed that the determination of fair market value of the sign plant will be based on an average sign in each of the five sign groups (poster, junior poster, bulletin, unipole *246 poster, and unipole bulletin). A number of the elements of value have been stipulated, but a number must be determined by the Court. The parties have agreed on no methodology for determining the value, if any, of the leasehold interest acquired by Turner. Also, they have not agreed that, if some such value is determined, it is depreciable. The assumption that the sign plant was acquired on a turnkey basis is the assumption that what was acquired was a put-together plant in good all-round working shape. Thus, the parties agree that overhead expenses and profit of a hypothetical contractor must be taken into account. The parties have assumed that the hypothetical contractor would construct the sign plant over the 1-1/2- to 2-year period immediately preceding August 1, 1983. The parties have assumed that the hypothetical contractor would be responsible for all aspects of construction, including procurement of display location leases. The parties have assumed that the hypothetical contractor would have an office and shop in Atlanta. The parties did not assume that the hypothetical contractor would construct a sign plant with the exact same specifications and characteristics as *247 the sign plant that Turner acquired, but rather a replacement sign plant of like utility and value. Nonetheless, to determine the characteristics of a comparable sign plant, the parties used an inventory of the actual sign plant acquired by Turner. To reflect the actual age of the sign plant acquired, the parties have assumed an adjustment for economic depreciation. D. Evidence Supporting Findings of Fact
In most respects, we are persuaded by the opinions of petitioner's experts as to the average costs of a sign in each category. This Court has previously concluded that extended discussions of evidence in valuation cases like this case may be of limited usefulness. Messing v. Commissioner, 48 T.C. 502, 512 (1967); Rudolph Inv. Corp. v. Commissioner, T.C. Memo. 1972-129. Thus, we will not delve into the specifics of the parties' factual arguments or the experts' opinions. We note, however, that we have not relied on respondent's expert, Hedenquist, in large part because we have serious reservations regarding the credibility of his appraisals. Hedenquist prepared two appraisal reports, one in 1991 and one in *248 1994, in preparation for the trial in this case. The appraisals were of the same property, as of the same time. The 1994 report is the primary support for respondent's position. Both of the reports appear to be based upon the same appraisal methodologies and assumptions used by petitioner's experts, but the total fair market value in the first report is half the amount in the second report. Hedenquist, however, could not provide the Court with an adequate explanation as to why the values differed in the two reports. [3]
We also note that we have relied primarily on the opinion of petitioner's expert Nelson, despite the fact that petitioner's other expert, Gray, testified that the overall value *249 given by Nelson was 15 percent to 20 percent too high. Although the result of our inquiry is a determination of the overall value of the purchased assets, the method upon which the parties have agreed, and indeed stipulated, requires us to make specific findings of value with respect to the numerous components that make up the sign plant. Only Nelson and Hedenquist give opinions with respect to the particular values of such components. Gray was not called upon (by either party) to testify as to the value of the individual components of the sign plant. Thus, Gray's opinion is of little help to the Court in making the various findings of value. The parties also presented evidence regarding Turner's operations. A number of Turner's employees have substantial experience in sign construction and lease procurement. It is true that the focus of our inquiry is to determine how much it would cost a hypothetical turnkey contractor to build the sign plant, and Turner, apparently, did not have the same capabilities or operations as the hypothetical contractor. Nonetheless, we have found that the evidence relating to Turner's operations corroborated the opinions of Nelson and Gray on many *250 issues, including material costs, labor hours, and lease procurement costs. We are also confirmed in the values we have determined by certain indicia of value agreed to by persons independent of petitioner or Turner. In particular, in the agreement by which Turner acquired the sign plant (the agreement), there was a provision relating to adjustments to the purchase price in the event of certain losses before the closing of the agreement. If necessary, a purchase price adjustment would have been made by multiplying the number of lost faces by certain agreed upon values for each type of face. The values set out in the agreement were either higher than, or approximately equal to, the values reached by Nelson. Previously, we have concluded that such "specific allocation in the purchase agreement * * * may be the best evidence of the purchaser's basis in each asset." Banc One Corp. v. Commissioner, 84 T.C. 476, 495 (1985), affd. without published opinion 815 F.2d 75 (6th Cir. 1987). Here, we rely on such data to support the values reached by Nelson. There are, however, several factual issues for which we have not accepted *251 the opinions of petitioner's experts. In particular, we have not accepted estimates relating to nonproductive labor hours and the need for structural drawings for the average sign. As to those issues, we have determined values of zero; petitioner has not carried its burden of proof. Rule 142(a). E. Leasehold Interests
We have found that the sign plant had a fair market value on August 1, 1983, that was less than $ 29,865,787. Thus, we must address petitioner's alternative argument that the assets purchased included a depreciable intangible asset in the form of the leasehold interests. Petitioner argues that there are at least two elements of value associated with the display location leases: (1) the cost of procuring the lease, and (2) the leasehold interest. With respect to procurement costs, such costs are included in our findings relating to the fair market value of the sign plant. Petitioner claims that the second element of value qualifies as a depreciable asset. Specifically, petitioner contends that the leasehold interests (as defined below) had a value of $ 6,528,771 as of August 1, 1983, and were amortizable over their 11.8-year useful life. Respondent argues *252 that petitioner has not carried its burden of showing that the leasehold interests are a depreciable asset. In Newark Morning Ledger Co. v. United States, 507 U.S.    ,    , 113 S. Ct. 1670, 1681 (1993) (quoting Rev. Rul. 68-483, 1968-2 C.B. 91-92), the Supreme Court quoted with approval the Commissioner's articulation of the central principle in cases involving the depreciation of assets: "'Whether or not an intangible asset, or a tangible asset, is depreciable for Federal income tax purposes depends upon the determination that the asset is actually exhausting, and that such exhaustion is susceptible of measurement.'" Section 167 is the section that allows a depreciation deduction, and the regulations interpreting section 167 provide a framework for determining whether an intangible asset is depreciable for tax purposes. Section 1.167(a)-3, Income Tax. Regs., provides in part: If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an *253 intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *
In Newark Morning Ledger v. United States, supra, the Court held that a taxpayer had shown that a newspaper's list of paid subscribers was a depreciable asset. The Court also held that, to carry its burden of proving that an intangible asset is depreciable, a taxpayer must "prove that [1] a particular asset can be valued and [2] that it has a limited useful life". Id. at    , 113 S. Ct. at 1681. Both of those elements must be proven with reasonable accuracy. Id. at    , 113 S. Ct. at 1680. The inquiry is a factual one. Id. Furthermore, the Court noted that the burden of proof "often will prove too great to bear." Id. at    , 113 S. Ct. at 1681. Here, petitioner bears the burden of proof. Rule 142(a). The primary *254 evidence that petitioner has presented on this issue is the appraisal report and testimony of its expert, Gray. The essential elements of petitioner's argument are stated in Gray's appraisal report: Leasehold Interest is an intangible asset which has a remaining life which can be reasonably estimated. The first component of the estimate of life is the fixed remaining term of the existing lease contracts. But, there is also the prospect for renewals and the continuation of favorable terms on short term leases. The estimation of the remaining life including the renewal component is one of the most important parts of the valuation analysis. A leasehold interest (as defined above) is the economic advantage [(monthly economic advantage)] that exists when the contract rent for the use of a property is exceeded by the rent which would be paid for the use of a comparable property in the open market. This intangible asset is best valued by computing the present value of the rental advantage over the remaining life of the leases.
Gray employed a three-step process to ascertain the value of the leasehold interests: (1) Determine the monthly economic advantage (disadvantage) *255 for each lease; (2) determine the remaining life of the leases; and (3) determine present value by discounting the value of the economic advantage (disadvantage) over the remaining life of the leases. The principal element of petitioner's argument is that, because many of the leases acquired by Turner were entered into years before Turner's acquisition of those leases, the actual contract rents for some of those leases were much lower than current economic rent (i.e., the rent that would be demanded of Turner for a present lease of the same or a similar site). Accordingly, those leases that required payment of less than the current economic rent had a monthly economic advantage to Turner. Nevertheless, according to Gray's computations, some leases had a monthly economic disadvantage. The premium paid by Turner was determined by summing the present values of the economic advantages and disadvantages for all the leases acquired by Turner. Respondent concedes: "A taxpayer who purchases a leasehold interest for a 'premium' generally may depreciate the premium associated with the favorable lease over the remaining term of the lease. Commissioner v. Moore, 207 F.2d 265 (9th Cir. 1953), *256 cert. denied347 U.S. 942 (1954)." Respondent's Brief at 71. Nevertheless, respondent argues that petitioner has failed to carry its burden of proving that Turner paid a premium. We agree. In his report, Gray states that he has examined leases from several metropolitan markets comparable to Atlanta and has interviewed lease managers from several comparable companies. He reaches two conclusions: (1) "Our analysis has indicated that a percentage relationship between the annual rent to annual revenue on a per face basis exists." and (2) "the fair market rent for a leased location is 15% of the gross potential revenue as of 1983." He adds: The cost of leasing sites had increased from an average of about 8 2/3% to approximately 15% from the 1970's through 1983. Because many of the TOA [Turner] leases were signed several years ago, the actual contract rents (for many leases) were much lower than the current economic rent. In addition, advertising rates have increased. These two factors have contributed to a significant overall leasehold advantage for the Company. [Id.]
We will accept for purposes of this opinion Gray's use of a percentage *257 of gross revenues as a measure of fair market rental value without considering whether it is in fact a proper measure. Gray's 15 percent of revenues assumption may well have been accurate for outdoor advertising companies in general, but we are concerned only with the fair market rents in Atlanta and the surrounding counties. Petitioner has not shown that Gray's 15-percent estimate was appropriate for that region. That fact is particularly important given Gray's opinion that the ratio has been increasing during the last 20 years. Only superficial attempts were made to corroborate Gray's opinions with evidence relating to 1983 Atlanta market rates. Moreover, although petitioner's other expert, Nelson, recognized the concept of a monthly rental advantage, and applied an analysis similar to that applied by Gray to determine the value of one leasehold interest in a certain parcel of improved real estate (value: $ 140,000), he found no similar monthly rental advantage for display location leases. In contrast, in Commissioner v. Moore, 207 F.2d 265 (9th Cir. 1953), revg. 15 T.C. 906 (1950), the case acknowledged by *258 respondent, the court noted that the taxpayer's three experts and one of the respondent's experts agreed that the rent being paid was not at the market rate. Id. at 273. Also, when asked by the Court if the hypothetical turnkey contractor would have been forced to procure display location leases with higher rents, Gray responded: In my opinion, yes, you would wind up with a more expensive lease base. Why? Because if you tried to shortchange all the * * * [lessors], your competitors would beat you to the punch and they would wind up with the sites because they would come in and try and offer a little bit more because it is really worth that.
Gray's response is too theoretical to be of much value to us. It makes various assumptions about the Atlanta market that were not adequately supported. We are not dealing with some hypothetical free market that functions independently of location, over an unrestricted period of time. For instance, what were the circumstances of Turner's competitors: What interest did they have in the Atlanta market? Were they in a position to acquire, in a short period of time, the sizable block of leases that was necessary to replace the *259 sign plant? We are unpersuaded that Gray's answer took all the necessary dynamics into account. In a nutshell, although Gray's analysis was complete, in the sense that it was logical and, on its own terms, consistent, we are unwilling to rely on its conclusions because we are unpersuaded as to important underlying assumptions, e.g., the identity between the Atlanta market and the national market. The critical question is the overall value of the leasehold interests, and that amount must be shown with "reasonable accuracy". Newark Morning Ledger Co. v. United States, 507 U.S. at    , 113 S. Ct. at 1680. Petitioner has failed to establish that amount with reasonable accuracy. Petitioner has failed to carry its burden of proof. III. Demolition and Takedown
During the years 1983 through 1987, we have found that Turner had the following sign demolitions or takedowns: Taxable Year
Demolitions or Takedowns
1983
41
1984
58
1985
64
1986
37
1987
37
Total
237
Furthermore, we have found that Turner typically returned all salvageable materials to inventory and properly accounted for such materials. Petitioner claimed loss deductions resulting *260 from those demolitions and takedowns. Respondent argues that petitioner has not shown that Turner sustained such deductible losses. In particular, respondent contends that, since Turner did not "abandon these signs in their entirety, * * * [petitioner] must prove what portion of the sign was lost and the value of the lost portion of the sign." Respondent's Brief at 74. Respondent contends that petitioner has failed to prove the value of what was lost or abandoned. We disagree. We believe that petitioner has carried its burden. Rule 142(a). The loss deduction amount equals (1) the fair market value of the sign as of the date of August 1, 1983, less (2) accumulated depreciation less (3) salvage value. As to the first factor, we have made extensive findings with respect to the fair market value of the signs and will not discuss those further. As to the second factor, the parties have agreed that the signs are depreciable under the accelerated method provided by section 168(b)(2)(A). Thus, any disputes relating to the first two factors of the loss deduction equation have been resolved. At trial, respondent's counsel conceded that there were two factual questions relating to *261 the remaining factor. First, how did Turner determine the cost of the salvaged materials that were returned to inventory? Petitioner argues that the salvage materials cost used by Turner was equal to 87.2 percent of the new cost of such materials. Respondent contends that Turner used a ratio that was less than 87.2 percent. From the testimony and exhibits presented, we conclude that Turner used the 87.2 percent amount. Second, did Turner return all salvageable materials to inventory? The parties have stipulated that Turner typically returned all reusable materials to inventory. We conclude that Turner did return salvageable materials to inventory. Petitioner has carried its burden of proof as to all of the factors that go into the loss deduction computation. Rule 142(a). Of course, to the extent that our fair market value findings differ from the values used by Turner, adjustments will be necessary. Decision will be entered under Rule 155. APPENDIX
STIPULATION OF COMPUTATIONS OF FAIR MARKET VALUE
IT IS HEREBY STIPULATED that, for purposes of this case, the parties agree to the stipulations and definitions set forth below. 1. The Lotus 1-2-3 spreadsheet contained *262 on the 3 1/2" computer disc, attached hereto as Exhibit A, represents the software program to be used by the Court in determining the fair market value of the signs purchased by petitioner on August 1, 1983. 2. For purposes of determining the fair market value of the signs purchased by petitioner on August 1, 1983, the signs shall be classified as poster, junior poster, bulletin, unipole poster, and unipole bulletin. The computations made pursuant to this stipulation are exclusive of the "Coca Cola bulletin," which has a stipulated value of $ 272,500. Stip. P 34. Each classification contains the number of structures and faces, as follows: Structures
Faces
Poster
1,177
2,120
Junior Poster
58
68
Bulletin
302
377
Unipole Posters
10
23
Unipole Bulletins
60
96
3. For purposes of calculating the fair market value of the signs purchased by petitioner on August 1, 1983, the words and phrases set forth below shall be defined as follows: a. Allocation Method-method of determining labor cost by allocating total labor hours among the categories of workers in a work crew and further determining a labor rate for each worker category. b. Average Labor Rate-hourly *263 wage earned by the average work crew and related costs, such as Federal Insurance Contribution Act tax, Federal Unemployment Tax Act tax, State Unemployment Act tax, Workers Compensation Insurance, health insurance, vacation, sick leave, and uniform costs. c. Average Labor Rate Method-method of determining labor cost which uses an average labor rate based upon the average of all the labor rates paid to the members of the average work crew. d. Bulletin Face-All bulletin panels, apron materials, scaffolding/platform, associated attachment hardware, and stringers; e. Construction Preparation-the cost incurred for the preparation of a plot plan, preparation of structural drawings and specifications by internal personnel, and cost of obtaining a permit, including attendance of hearings; f. Junior Poster Face-all panels, trim and trim brackets and associated hardware necessary to construct a complete junior poster face; g. Multiple Face Factors-factors shall be used to convert face and illumination cost to a per structure costs. The following factors are based upon the face to structure ratio for each sign category. Category
Factor
Poster
1.8011
Junior Poster
1.1724
Bulletin
1.2483
Unipole Poster
2.3
Unipole Bulletin
1.6
*264 h. Poster Face-all poster panels, trim, trim brackets, scaffolding/platform, associated attachment hardware, and stringers; i. Sales Tax-tax imposed on retail sales under O.C.G.A. § 48-8-30 (1982), compensating use tax imposed on retail sales under O.C.G.A. § 48-8-30(c) (1982), and any additional sale or use tax imposed by a county or municipality of the state of Georgia. j. Unipole Bulletin Face-all bulletin panels, apron and assembly hardware, but not to include scaffolding/platform, associated assembly hardware, and stringers; and k. Unipole Poster Face-all poster panels, trim and trim brackets and associated assembly hardware, not to include scaffolding/platform, associated assembly hardware, and stringers. IT IS FURTHER STIPULATED that for purposes of this case, the parties agree to the following methodology to be used by the Court for determining the fair market value of outdoor advertising signs purchased by petitioner, as of August 1, 1983. FACE
4. The Court shall determine materials, manufacturer, and costs for poster, bulletin, unipole poster, and unipole bulletin face materials. 5. The face materials cost for an average junior poster is $ 202 per face. *265 6. The face materials cost for each sign category shall be adjusted for sales tax. The Court shall determine the sales tax rate to be applied to the face materials cost. 7. The Court shall further determine whether face material cost is adjusted for freight, handling, crating, waste, or quantity discount, or storage, handling, and finance charges. The Court shall further determine the amount or rate of any applicable adjustments. The adjusted face materials cost for each sign category shall be multiplied by the multiple face factors to determine face material cost for the average sign structure in each sign category. ILLUMINATION
8. The illumination materials cost for the average poster is $ 785 per structure. 9. The illumination materials cost for the average bulletin is $ 1,758 per structure. 10. The illumination materials cost for the average junior poster is zero dollars. 11. The illumination materials cost for the average unipole poster is $ 1,304 per structure. 12. The illumination materials cost for the average unipole bulletin is $ 3,186 per structure. 13. The illumination materials cost for each sign category shall be adjusted for sales tax. The Court *266 shall determine the applicable sales tax rate for illumination materials cost. 14. The Court shall further determine whether illumination materials cost is adjusted for freight, handling, crating, waste, or quantity discount, or storage, handling, and finance charges. The Court shall further determine the rate or amount of any applicable adjustments. FRAME MATERIAL COSTS
15. The frame material costs for the average poster frame is $ 1,236. 16. The frame material costs for the average bulletin frame is $ 4,146. 17. The materials cost for the average junior poster frame is $ 143.26. 18. The frame materials cost for the average unipole structure for both poster and bulletin type signs is $ 22,850 per structure. The Court shall determine whether frame materials cost for the average unipole structure is a direct materials cost or a subcontract cost. If the Court finds it a direct materials cost, the amount is entered as a frame material cost. If the Court finds a subcontract cost, the amount is entered under other costs. 19. The Court shall determine whether the unipole contracts (whether a direct materials cost or a subcontract work cost) included sales tax. If the *267 Court determines the unipole contracts did not include sales tax, then the frame materials cost for the average unipole shall be adjusted for sales tax. The Court shall determine the applicable sales tax rate. 20. The frame materials cost for each sign category shall be adjusted for sales tax. The Court shall determine the applicable sales tax rate for frame material costs. 21. The Court shall further determine whether frame materials cost is adjusted for freight, handling, crating, waste, or quantity discount, or storage, handling, and finance charges. The Court shall further determine the rate or amount of any applicable adjustments. LABOR
22. The Court shall determine the total number of hours necessary to construct the average poster, junior poster, and bulletin. The Court shall further determine the number of hours necessary to assemble and erect the average unipole poster face and unipole bulletin face. 23. The Court shall determine whether labor cost is determined using the average labor rate method or the allocation method. 24. If the Court determines the average labor rate method is the appropriate method, the Court shall determine the average labor rate. *268 Labor hours for each sign category shall be multiplied by the average labor rate to determine labor cost under this method. 25. If the Court determines the allocation method is the appropriate method, the Court shall determine the labor rate applicable for each labor category. The Court shall further determine the percentage of the total labor hours to be allocated to each labor category. The labor rate for each labor category shall be multiplied by the allocable portion of labor hours to determine each category is labor cost. The Court shall further determine whether labor costs shall be increased for non-productive time, and, if so the applicable percentage of such increase. Total labor costs shall be the sum of the labor cost for all labor categories under this method increased, if applicable, for non-productive time. OTHER COSTS
26. The cost of the average poster, junior poster, and unipole poster shall be increased by $ 37 for the permit fee cost per structure. 27. The cost of the average bulletin and unipole bulletin shall be increased by $ 87 for permit fee cost per structure. 28. The Court shall determine whether an application fee due the City of Atlanta *269 for permit applications should be added to the permit fees of $ 37.00 and $ 87.00. If the Court determines a permit application cost should be added to said permit fees cost, the Court shall further determine the amount of the application fee. 29. The cost of the average poster, junior poster, bulletin, unipole poster, and unipole bulletin shall be increased by $ 123 for construction preparation cost. 30. The Court shall determine the rate to be applied to sign cost for overhead. The Court shall further determine which costs shall be subject to the overhead rate and which costs are indirect costs included in the overhead rate. 31. The Court shall determine which costs associated with each average sign is subject to the profit rate. Those costs of the average poster, junior poster, bulletin, unipole poster, and bulletin poster determined to be subject to the profit rate shall be increased by a profit rate of ten percent. 32. The Court shall determine whether the costs of the average poster, junior poster, bulletin, unipole poster, and unipole bulletin shall be increased for the acquisition of engineering drawings. If the Court determines an adjustment for engineering drawing *270 is applicable, the Court shall further determine the rate of said adjustment. 33. The Court shall determine whether the costs of the average poster, junior poster, and bulletin shall be increased for auger rental. If the Court determines an adjustment for auger rental is applicable, the Court shall further determine the rate of said adjustment. 34. The Court shall determine whether the unipole frame materials cost is a direct materials cost or a subcontract cost (see Para. 18). The Court shall further determine whether the unipole frame materials cost includes sales tax or must be adjusted for sales tax. If said adjustment is necessary, the Court shall determine the rate of sales tax. 35. The Court shall determine whether the cost of the average poster, junior poster, and bulletin shall be subject to a general contracting surcharge on engineering drawing cost and auger rental. The Court shall determine whether the cost of the average unipole poster structure and unipole bulletin structure shall be subject to a general contracting surcharge on engineering drawing cost and unipole frame materials cost (if determined to be a subcontracted cost.) If the Court determines a general *271 contracting surcharge is applicable, the Court shall further determine the rate of said surcharge. 36. The Court shall further determine whether lease procurement cost is an indirect or direct cost of each sign structure. 37. If the Court determines lease procurement cost is an indirect cost of construction, lease procurement cost shall be added to total direct costs and not specifically allocated on a per structure basis. 37. If the Court determines lease procurement cost is a direct cost of each sign structure, the Court shall determine the cost associated with the procurement of an average lease. This cost shall then be multiplied by 1,278, this being the total lease procurement cost. The total lease procurement costs shall then be divided by 1,607, resulting in the per structure lease procurement cost. The costs of the average poster, junior poster, bulletin, unipole poster, and unipole bulletin shall be increased for the per structure lease procurement cost. TOTAL COSTS
38. Total costs of the average poster and bulletin structure shall be the sum of average face materials cost, average illumination materials cost, average frame materials cost, (adjusted for quantity *272 discount, and/or freight, handling, creating, waste, and/or storage, handling, and finance charge as the Court deems applicable), labor cost, sales tax, lease procurement cost (if determined to be a direct cost), permit fee cost, overhead, construction preparation cost, profit, engineering drawing cost (if any), auger rental cost (if any), and general contracting surcharge (if any). 39. The total cost of the average junior poster structure shall be the sum of average face materials cost, average frame materials cost, (adjusted for quantity discount, and/or freight, handling, creating, waste, and/or storage, handling, and finance charge as the Court deems applicable), labor cost, permit fee cost, construction preparation cost, sales tax, overhead, lease procurement cost (if determined to be a direct cost), profit, engineering drawing cost (if any), auger rental cost (if any), and general contracting surcharge (if any). 40. The total costs of the average unipole poster and unipole bulletin structure shall be the sum of the average face materials cost, average frame materials cost (as either a direct materials cost or as a subcontracted cost) average illumination materials cost, *273 (adjusted for quantity discount, and/or freight, handling, creating, waste, and/or storage, handling, and finance charge as the Court deems applicable), permit fee cost, lease procurement cost (if determined to be a direct cost), construction preparation cost, overhead, sales tax on the costs the Court determines are subject thereto, labor cost, engineering drawing costs (if any), general contracting surcharge (if any), and profit. 41. The cost of an average structure in each structure category shall be multiplied by the following numbers to determine total category costs. Category
Number
Poster
1,177
Junior Poster
58
Bulletin
302
Unipole Poster
10
Unipole Bulletin
60
42. If the Court determines lease procurement cost is an indirect cost, it shall be added to total category cost. 43. The total category cost shall be adjusted for overhead by the method determined by the Court. 44. Total category costs for each category shall be adjusted for depreciation at the rate of 12 1/2 percent. EXHIBIT A TURNER OUTDOOR ADVERTISING FACTS TO BE DETERMINED BY THE COURT PART I MATERIAL COST POSTER
DESCRIPTION
UNIT
FACE/
TOTAL
COST
STRUCTURE
STRUCTURE
FACTOR COST 1 COST OF A POSTER:
A FACE, PLATFORM, AND TRIM
MATERIAL
1,303.00
1.8011
2,346.83
QUANTITY DISCOUNT
-PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
-% RATE
-AMOUNT
0.00
STORAGE, FINANCE
0.00%
& HANDLING
-% RATE
-AMOUNT
0.00
B LIGHTING
MATERIAL
STIPULATED
436.00
1.8011
785.28
QUANTITY DISCOUNT
-PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
- %RATE
-AMOUNT
STORAGE, FINANCE
0.00%
HANDLING
-% RATE
-AMOUNT
C FRAME
MATERIAL
STIPULATED
1,236.00
1.0000
1,236.00
QUANTITY DISCOUNT
-PERCENTAGE
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
-% RATE
-AMOUNT
STORAGE, FINANCE &
0.00%
HANDLING
-% RATE
-AMOUNT
MATERIAL COST
JUNIOR POSTER
2 COST OF A JUNIOR POSTER
A FACE AND TRIM
MATERIAL
STIPULATED
202.00
1.1724
236.82
QUANTITY DISCOUNT
- PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING,
-% RATE
10.00%
HANDLING & WASTE
-AMOUNT
0.00
STORAGE, FINANCE 7 HANDLING
-% RATE
0.00%
-AMOUNT
0.00
B LIGHTING
MATERIAL
None
QUANTITY DISCOUNT
-PERCENTAGE
SALES TAX RATE
FREIGHT, CRATING,
-% RATE
0.00%
HANDLING 7 WSTE
-AMOUNT
0.00
STORAGE, FINANCE & HANDLING
-% RATE
0.00
-AMOUNT
0.00
C FRAME
MATERIAL
STIPULATED
143.26
1.0000
143.26
QUANTITY DISCOUNT
- PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING,
- & RATE
10.00%
HANDLING 7 WASTE
-AMOUNT
0.00
STORAGE, FINANCE & HANDLING
-% RATE
0.00%
- AMOUNT
0.00
3 COST OF A BULLETIN
A FACE, PLATFORM AND APRON
MATERIAL
4,485.65
1.2483
5,559.44
QUALTITY DISCOUNT
- PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
-% RATE
-AMOUNT
0.00
STORAGE, FINANCE
0.00%
& HANDLING
-% RATE
-AMOUNT
0.00
B LIGHTING
MATERIAL
STIPULATED
1,408.00
1.2483
1,757.61
QUANTITY DISCOUNT
- PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
-% RATE
-AMOUNT
0.00
STORAGE, FINANCE
0.00%
& HANDLING
-% RATE
-AMOUNT
0.00
C FRAME
MATERIAL
STIPULATED
4,146.00
1.0000
4,146.00
QUANTITY DISCOUNT
- PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
-% RATE
- AMOUNT
0.00
STORAGE, FINANCE &
0.00%
HANDLING
-% RATE
-AMOUNT
0.00
4 COST OF A UNIPOLE POSTER
A FACE, AND TRIM
MATERIAL
J1,055.00
2.3000
2,426.50
QUALTITY DISCOUNT
- PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
-% RATE
-AMOUNT
0.00
STORAGE, FINANCE
0.00%
& HANDLING
-% RATE
-AMOUNT
0.00
B LIGHTING
MATERIAL
STIPULATED
566.78
2.3000
1,303.59
QUANTITY DISCOUNT
- PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
-% RATE
-AMOUNT
0.00
STORAGE, FINANCE
0.00%
& HANDLING
-% RATE
-AMOUNT
0.00
C FRAME  IF UNIPOLE FRAME MATERIAL COST IS  A DIRECT MATERIAL COST,  ENTER 1; IF UNIPOLE FRAMEMATERIAL FRAME COST IS A
SUBCONTRACT COST, ENTER 2>.
2
MATERIAL
STIPULATED
0.00
1.0000
0.00
QUANTITY DISCOUNT
- PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
-% RATE
- AMOUNT
0.00
STORAGE, FINANCE &
0.00%
HANDLING
-% RATE
-AMOUNT
0.00
5 COST OF A UNIPOLE BULLETIN
A FACE, AND APRON
MATERIAL
3,516.80
1.6000
5,626.88
QUALTITY DISCOUNT
- PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
-% RATE
-AMOUNT
0.00
STORAGE, FINANCE
0.00%
& HANDLING
-% RATE
-AMOUNT
0.00
B LIGHTING
MATERIAL
STIPULATED
J1,991.00
1.6000
3,185.60
QUANTITY DISCOUNT
- PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
-% RATE
-AMOUNT
0.00
STORAGE, FINANCE
0.00%
& HANDLING
-% RATE
-AMOUNT
0.00
C FRAME  IFUNIPOLE FRAME MATERIAL COST  IS A DIRECTMATERIAL COST,  ENTER 1; IF UNIPOLE FRAME MATERIAL FRAME COST IS A
SUBCONTRACT COST, ENTER 2>
2
MATERIAL
STIPULATED
0.00
1.0000
0.00
QUANTITY DISCOUNT
- PERCENTAGE
0.00%
SALES TAX RATE
4.50%
FREIGHT, CRATING, HANDLING
10.00%
& WASTE
-% RATE
- AMOUNT
0.00
STORAGE, FINANCE &
0.00%
HANDLING
-% RATE
-AMOUNT
0.00
*274 NOTE: SHADEDREGIONS INDICATE THOSE VALUES OR ISSUES FOR WHICH THE PARTIES HAVE REQUESTED FINDINGS OF THE COURT. TURNER OUTDOOR ADVERTISING FACTS TO BE DETERMINED BY THE COURT PART II AVERAGE CONSTRUCTION HOURS AND LABOR COST
TOTAL
HOURS
1. AVERAGE LABOR HOURS TO CONSTRUCT:
A. POSTER
250.63
B. JUNIOR POSTER
29.47
C. BULLETIN
522.86
D. UNIPOLE, POSTER
184.78
E. UNIPOLE, BULLETIN
314.34
F. COST FACTOR FOR NONPRODUCTIVE TIME
0.00%
2. LABOR RATES
2.A AVERAGE HOURLY LABOR COST
DESCRIPTION
RATES
AMOUNT
AMOUNT
BASE WAGE PER HOUR
0.00
LABOR RATE BUILT-UP
FICA
.670%
0.00
FUTA
0.80%
0.00
SUTA
2.70%
0.00
MEDICAL INSURANCE
0.00
WORKMENS COMP
8.09%
0.00
UNIFORM COST
0.00
HVS COST
0.00
TOTAL ADDED COST
0.00
TOTAL AVERAGE HOURLY COST
0.00
2.B LABOR HOURLY RATES BY CATEGORY TO INCLUDE ALL BUILT-UP COST
DESCRIPTION
CREW CHIEF/CRANE OPERATOR
CONSTRUCTION
ELECTRICIAN
PAINTER
3. AVERAGE SIGN LABOR COST USING AVERAGE HOURLY WAGE (2.A ABOVE)
SIGN TYPE
AVERAGE
AVERAGE
TOTAL
CONSTRUC
HOURLY
SIGN
HOURS
WAGE
COST
POSTER
250.63
0.00
0.00
JUNIOR POSTER
29.47
0.00
0.00
BULLETIN
522.86
0.00
0.00
UNIPOLE, POSTER
184.78
0.00
0.00
UNIPOLE, BULLETIN
314.34
0.00
0.00
*275 4. AVERAGE SIGN LABOR COST USING LABOR RATES BY CATEGORY (2.B ABOVE)
4.A POSTERS-HOURS
250.63 (1.A ABOVE)
LABOR
PERCENTAGE
HOURS
WAGE
TOTAL
CATEGORY
ALLOCATION
WORKED
HOURLY
LABOR
COST
COST
CRANE OPERATOR
9.60%
24.05
15.87
381.67
LABOR - 3 EA
72.85%
182.58
15.07
2,751.48
ELECTRICIAN
10.68%
26.77
18.60
497.92
PAINTER
6.87%
17.23
17.00
292.91
SUBTOTAL
100.00%
250.63
3,923.99
FACTOR FOR NONPRODUCTIVE TIME
0.00%
0.00
TOTAL
3,923.99
4.B JUNIOR POSTERS - HOURS
29.47 (1.B ABOVE)
LABOR
PERCENTAGE
HOURS
WAGE
TOTAL
CATEGORY
ALLOCATION
WORKED
HOURLY
LABOR
COST
COST
CRANE OPERATOR
0.00%
0
15.87
0.00
LABOR-3 EA
87.75%
25.86
15.07
389.71
ELECTRICIAN
0.00%
0
18.60
0.00
PAINTER
12.25%
3.61
17.00
61.37
SUBTOTAL
100.00%
29.47
451.08
FACTOR FORNONPRODUCTIVE TIME
0.00%
0.00
TOTAL
4.C BULLETINS - HOURS
522.86 (1.C ABOVE)
LABOR
PERCENTAGE
HOURS
WAGE
TOTAL
CATEGORY
ALLOCATION
WORKED
HOURLY
LABOR
COST
COST
CRANE OPERATOR
J7.15%
37.38
15.87
593.22
LABOR- 3 EA
75.88%
396.75
15.07
5,979.02
ELECTRICIAN
8.99%
47.03
18.60
874.76
PAINTER
7.98%
41.7
17.00
708.90
SUBTOTAL
100.00%
522.86
8,155.90
FACTOR FOR NONPRODUCTIVE TIME
0.00%
0.00
TOTAL
8,155.90
*276 4.D UNIPOLE, POSTER - HOURS
184.78 (1.D ABOVE)
LABOR
PERCENTAGE
HOURS
WAGE
TOTAL
CATEGORY
ALLOCATION
WORKED
HOURLY
LABOR
COST
COST
CRANE OPERATOR
7.21%
13.33
15.87
211.55
LABOR - 3 EA
72.22%
133.45
15.07
2,011.09
ELECTRICIAN
20.56%
38
18.60
706.80
PAINTER
0.00%
0
17.00
0.00
SUBTOTAL
100.00%
184.78
2,929.44
FACTOR FOR NONPRODUCTIVE TIME
0.00%
0.00
TOTAL
2,929.44
4.E UIPOLE, BULLETIN HOURS
314.34 (1.E ABOVE)
LABOR
PERCENTAGE
HOURS
WAGE
TOTAL
CATEGORY
ALLOCATION
WORKED
HOURLY
LABOR
COST
COST
CRANE OPERATOR
9.64%
30.3
15.87
480.86
LABOR - 3 EA
65.38%
205.53
15.07
3,097.34
ELECTRICIAN
24.98%
78.51
18.60
1,460.29
PAINTER
0.00%
0
17.00
0.00
SUBTOTAL
100.00%
314.34
5,038.48
FACTOR FOR NONPRODUCTIVE TIME
0.00%
0.00
TOTAL
5,038.48
TURNER OUTDOOR ADVERTISING FACTS TO BE DETERMINED BY THE COURT PART III OTHER COST FACTORS - PER STRUCTURE 1 LEASE PROCUREMENT
795.00
[1]
2 PERMIT COST - POSTER
37.00 STIPULATED
3 PERMIT COST - BULLETIN
87.00 STIPULATED
4 APPLICATION FEE - ATLANTA:
[2]
POSTER
135.00
JUNIOR POSTER
21.00
BULLETIN
210.00
UNIPOLE POSTER
135.00
UNIPOLE BULLETIN
311.00
5 CONSTRUCTION PREPARATION
123.00 STIPULATED
6 SUBCONTRACTED WORK:
UNIPOLE FRAME COST
23,878.25
AUGER RENTAL
700.00
7 DRAWINGS
0.00%
[3]
8 SUPERVISION
10.00%
[4]
*277 TURNER OUTDOOR ADVERTISING FACTS TO BE DETERMINED BY THE COURT PART IV COST FACTORS FOR TOTAL PLANT PERCENTAGE
DESCRIPTION
/AMOUNT 1 MISCELLANEOUS CONSTRUCTION
MATERIAL AND TOOLS
0.00
2 SPECIALIZED VEHICLES
AND EQUIPMENT
0.00
3 OVERHEAD - PERCENTAGE
30.00%
4 PROFIT - PERCENTAGE
10.00% STIPULATED
5 DEPRECIATION - PERCENTAGE
12.50% STIPULATED
6 LEASE PROCUREMENT COST
0.00
[5]
TURNER OUTDOOR ADVERTISING FACTS TO BE DETERMINED BY THE COURT PART V POSTERS
DESCRIPTION
FACE
LIGHTING
FRAME
LABOR
MATERIAL COST
2,346.83
785.28
1,236.00
QUANTITY DISCOUNT
0.00
0.00
0.00
NET PURCHASE PRICE
2,346.83
785.28
1,236.00
SALES TAX
105.61
35.34
55.62
FREIGHT, CRATING, ETC.
AS A PERCENT
234.68
78.53
123.60
AS AN AMOUNT
0.00
0.00
0.00
STORAGE, FINANCE, ETC.
AS A PERCENT
0.00
0.00
0.00
AS AN AMOUNT
0.00
0.00
0.00
2,687.12
899.15
1,415.22
3,923.99
8,925.48
JUNIOR POSTERS
DESCRIPTION
FACE
LIGHTING
FRAME
LABOR
MATERIAL COST
236.82
NONE
143.26
QUANTITY DISCOUNT
0.00
0.00
0.00
NET PURCHASE PRICE
236.82
0.00
143.26
SALES TAX
10.66
0.00
6.45
FREIGHT, CRATING, ETC.
AS A PERCENT
23.68
0.00
14.33
AS AN AMOUNT
0.00
0.00
0.00
STORAGE, FINANCE, ETC.
AS A PERCENT
0.00
0.00
0.00
AS AN AMOUNT
0.00
0.00
0.00
271.16
0.00
164.03
451.08
TOTAL SIGN COST
886.28
BULLETINS
DESCRIPTION
FACE
LIGHTING
FRAME
LABOR
MATERIAL COST
5,599.44
1,757.61
4,146.00
QUANTITY DISCOUNT
0.00
0.00
0.00
NET PURCHASE PRICE
5,599.44
1,757.61
4,146.00
SALES TAX
251.97
79.09
186.57
FREIGHT, CRATING, ETC.
AS A PERCENT
559.94
175.76
414.60
AS AN AMOUNT
0.00
0.00
0.00
STORAGE, FINANCE, ETC.
AS A PERCENT
0.00
0.00
0.00
AS AN AMOUNT
0.00
0.00
0.00
6,411.36
2,012.46
4,747.17
8,155.90
TOTAL SIGN COST
21,326.89
UNIPOLE POSTERS
DESCRIPTION
FACE
LIGHTING
FRAME
LABOR
MATERIAL COST
2,426.50
1,303.59
0.00
QUANTITY DISCOUNT
0.00
0.00
0.00
NET PURCHASE PRICE
2,426.50
1,303.59
0.00
SALES TAX
109.19
58.66
0.00
FREIGHT, CRATING, ETC.
AS A PERCENT
242.65
130.36
0.00
AS AN AMOUNT
0.00
0.00
0.00
STORAGE, FINANCE, ETC.
AS A PERCENT
0.00
0.00
0.00
AS AN AMOUNT
0.00
0.00
0.00
2,778.34
1,492.62
0.00
2,929.44
TOTAL SIGN COST
7,200.40
UNIPOLE BULLETIN
DESCRIPTION
FACE
LIGHTING
FRAME
LABOR
MATERIAL COST
5,626.88
3,185.60
0.00
QUANTITY DISCOUNT
0.00
0.00
0.00
NET PURCHASE PRICE
5,626.88
3,185.60
0.00
SALES TAX
253.21
143.35
0.00
FREIGHT, CRATING, ETC.
AS A PERCENT
562.69
318.56
0.00
AS AN AMOUNT
0.00
0.00
0.00
STORAGE, FINANCE, ETC.
AS A PERCENT
0.00
0.00
0.00
AS AN AMOUNT
0.00
0.00
0.00
6,442.78
3,647.51
0.00
5,038.48
TOTAL SIGN COST
15,128.77
*278 TURNER OUTDOOR ADVERTISING FACTS TO BE DETERMINED BY THE COURT PART VI SUMMARY OF PLANT VALUATION DESCRIPTION
POSTER
JUNIOR
BULLETIN
POSTER
DIRECT COST
FACE
2,687.12
271.16
6,411.36
LIGHT
899.15
0.00
2,012.46
FRAME
1,415.22
164.03
4,747.17
LABOR
3,923.99
451.08
8,155.90
SUBTOTAL
8,925.48
886.28
21,326.89
OTHER COST
LEASE PROCUREMENT
795.00
795.00
795.00
PERMIT, POSTER
37.00
37.00
0.00
PERMIT, BULLETIN
0.00
0.00
87.00
PERMIT, ATLANTA
135.00
21.00
210.00
CONSTRUCTION PREP.
123.00
123.00
123.00
SUBCONTRACTED WORK
700.00
700.00
700.00
DRAWINGS
0.00
0.00
0.00
SUPERVISION
70.00
70.00
70.00
SUB TOTAL
1,860.00
1,746.00
1,985.00
TOTAL PER
STRUCTURE COST
10,785.48
2,632.28
23,311.89
TIMES
STRUCTURES
1,177
58
302
CLASS TOTAL
12,694,504.51
152,672.08
7,040,189.47
PLANT TOTAL
DESCRIPTION
UNIPOLE
UNIPOLE
POSTER
BULLETIN
DIRECT COST
FACE
2,778.34
6,442.78
LIGHT
1,492.62
3,647.51
FRAME
0.00
0.00
LABOR
2,929.44
5,038.48
SUBTOTAL
7,200.40
15,128.77
OTHER COST
LEASE PROCUREMENT
795.00
795.00
PERMIT, POSTER
37.00
0.00
PERMIT, BULLETIN
0.00
87.00
PERMIT, ATLANTA
135.00
311.00
CONSTRUCTION PREP.
123.00
123.00
SUBCONTRACTED WORK
23,878.25
23,878.25
DRAWINGS
0.00
0.00
SUPERVISION
2,387.83
2,387.83
SUB TOTAL
27,356.08
27,582.08
TOTAL PER
STRUCTURE COST
34,556.47
42,710.85
TIMES
STRUCTURES
10
60
CLASS TOTAL
345,564.71
2,562,650.92
PLANT TOTAL
22,795,581.70
PLANT TOTAL(CONTINUED)
22,795,581.70
MISCELLANEOUS CONSTRUCTION
0
MATERIAL AND TOOLS
SPECIALIZED VEHICLES
AND EQUIPMENT
0
SUB TOTAL
22,795,581.70
OVERHEAD
30.00%
6,838,674.51
PROFIT
10.00%
2,279,558.17
TOTAL VALUE BEFORE DEPRECIATION
31,913,814.38
LESS DEPRECIATION AT
12.50%
3,989,226.80
SUB TOTAL
27,924,587.58
LEASE PROCUREMENT
0.00
TOTAL FAIR MARKET VALUE
AS OF 08/01/83
27,924,587.58
*279 Footnotes
1. Petitioner's expert Gerald G. Gray is of the opinion that certain of the display location leases acquired by petitioner were economically advantageous to petitioner because they carried a below-market rent. We use the term "sign plant" to refer to the signs and display locations acquired by petitioner exclusive of any value attributable to such economic advantage. We deal separately with such economic advantage in sec. II.E., infra↩.
1. Findings of the Court relating to labor hours for an average unipole poster or unipole bulletin are exclusive of the labor hours to build the unipole frame.↩
1. This table is a reproduction of certain results arrived at by executing the spreadsheet that forms part of the computation stipulation. Arithmetical errors apparent in the table may be corrected by the parties as part of their computations pursuant to Rule 155.↩
2. Reference to the sign plant does not include the Coca Cola Bulletin, to which the parties have agreed to an allocation of $ 272,500 of the total purchase price.↩
3. The situation here is different than in a recently decided case, Rimmer v. Commissioner, T.C. Memo. 1995-215↩, where respondent's expert, whose two valuation analyses of identical property yielded substantially divergent values, used different methodologies in determining the two amounts.
1. IF AN AMOUNT IS ENTERED HERE NO ENTRY SHOULD BE MADE  IN ITEM 6, PART IV.↩
2. AN EXTRA APPLICATION FEE, BASED ON FACE SIZE, CHARGED FOR SIGNS LOCATED IN ATLANTA ONLY↩
3. DRAWINGS AS A PERCENTAGE OF ALL COSTS EXCLUDING SUPERVISION, OVERHEAD, PROFIT AND LEASE PROCUREMENT (ASSUMING LEASE  PROCUREMENT IS AN INDIRECT COST).↩
4. SUPERVISION IS A PERCENTAGE OF SUBCONTRACTED WORK AND DRAWINGS↩
5. IF AN AMOUNT IS ENTERED HERE NO ENTRY SHOULD BE MADE  AT ITEM 1, PART III.↩